CANADIAN IMPROVEMENT COMPANY et al.

*v.*

J. TATNALL LEA et al.

[Decided March 12th, 1908.]

1. Complainant being indebted to defendants and others, particularly to the province of Ontario, desired to renew its notes to the latter, which demanded as a condition precedent that it secure a renewal from the other creditors also, and accordingly complainant entered into an agreement with defendants, consisting of a letter and a formal agreement, the letter reciting that in consideration of defendants' bank signing the attached agreement complainant agreed to cause to be transferred to defendants or their nominees, before the maturity of the notes, certain stock of the S. company pledged with defendants as collateral, with express power to vote thereon, and also to procure the resignation of two directors of that company, to be filled by defendants' nominees, and the formal agreement signed at the same time stipulated that in consideration of the Ontario government renewing the loan to complainant defendants agreed that on payment to it of ten per cent. of its indebtedness at maturity to renew the notes for the balance, to be secured by the

same collateral, the agreement not to be binding unless signed by the holders of ninety per cent. in value of the notes of complainant company, and time to be of the essence of the agreement. The Ontario government renewed its notes, but complainant was unable to raise the ten per cent. payment agreed upon, and some two months thereafter a new paper was drawn and signed by the parties, which was the same as the former agreement, except eliminating the provisions for payment of ten per cent. of the indebtedness and requiring all the holders of the notes to sign, and striking out the provision making time of the essence.—*Held*, that, while the letter referred in terms to the first agreement, it did not become inoperative when that agreement was modified, and the second agreement was nothing more than a change in the terms of the first agreement, and the letter continued a part of the contract.

2. While defendants had a right, under the agreement, to insist that complainant secure the election of two directors of their nomination and give them the voting power of the stock, before maturity of the notes and their renewal, they did not lose that right by renewing without requiring this done, since that was one of the considerations upon which the agreement for the renewal was based.

3. If complainant's agents, when they made the agreement with defendants to transfer the pledged stock and to secure the appointment of the directors, did not have any authority to do so, complainant must either accept the contract as a whole and be bound thereby, or repudiate the contract in its entirety, and restore defendants to their position before making the contract.

4. *P. L. 1896 p. 290 § 37* provides that every person pledging stock as collateral may represent it at all meetings, and vote thereon as a stockholder, unless in the transfer to the pledgee on the books of the corporation he shall have expressly empowered the pledgee to vote thereon, when only the pledgee may vote thereon. In consideration of defendants' renewing certain notes, complainant agreed to transfer to them certain stock pledged as collateral for the notes, and to insert in such transfer on the corporate books express power to vote the stock.—*Held*, that the statute applied to cases in which a transfer gave notice to the corporation that the transferee was a pledgee, and as between the corporation and the parties to the transfer the corporation must recognize the registered holder, and the legal title of the stock being vested in defendants on the corporate books, they had the right to vote it.

5. The right of a pledgor to vote stock, the legal title to which is in his pledgee, must be obtained by application to equity for a proxy, and the court, if it finds that the pledgee is under obligations to give the proxy, will so decree.

Heard on bill, answers, cross-bills and answers, with respective replications and proofs in open court.

The bill in this case charges that the complainant Canadian Improvement Company is the the owner of fifty thousand shares

of the capital stock of a corporation named Lake Superior Corporation; that the said complainant had pledged this stock with certain banks and bankers in the city of Philadelphia and elsewhere for loans made upon notes of the complainant company aggregating $2,732,000; that the stock in question was issued in the names of Charles E. Orvis and John T. Terry, Jr., who held it for the complainant company; that the stock certificates so transferred in pledge had the power of attorney on the back of each, signed by these persons in whose names the certificates stood; that the loans, to secure which the certificates were deposited, were made upon the 28th day of May, 1907, and ran for one year; that in the early part of September, 1907, the pledgees in each case procured the Lake Superior Corporation to transfer upon its books each certificate of stock to the pledgee thereof, and that these present holders of record claimed the right to vote the said stock, which the complainants charge, under the law of New Jersey, they had no right to do. The complainants, therefore, prayed an injunction to prevent the persons or corporations into whose names the certificates of stock had been transferred from voting upon the same.

The answers set out that the loans of the 28th of May, 1907, were renewals of previous loans made three years prior to that date and maturing on that date; that the certificates of stock had been deposited as collateral with these earlier loans; that the complainant company, in March of 1907, was desirous of procuring an agreement for the extension of the loans to fall due on the 28th of May, 1907; that this desire was prompted by the fact that a million dollars of loans of this complainant company were obtained from lenders in Canada and were guaranteed by the government of the province of Ontario; that these Canadian loans fell due on the 1st of April, 1907, and the government of the province aforesaid would not consent to renewing the guaranty unless the loans at Philadelphia aforesaid, maturing on the 28th of May, were likewise extended for the period desired, namely, one year; that in pursuance of a desire to secure favorable action by the province of Ontario and a renewal of the notes in Philadelphia, the complainants, acting through the agency of one Clergue, agreed with the bankers,

the defendants, on the 27th day of March, 1907, that the stock held by each of the bankers as collateral should be transferred to them with an express power to vote upon the same, and that it was upon this condition that the bankers agreed to renew the loans. They allege that the complainants also agreed to displace immediately two of the existing directors of the Lake Superior Corporation and put in their places two persons selected by the defendants.

Since, in the findings of fact hereafter to be stated, fuller reference will be made to these matters, it is not deemed useful to expand this statement of the pleadings.

The answer has accompanying it a cross-bill in which the defendants charge the above facts and pray that it be decreed that they should have from the complainant company an express power to vote, or that the *status quo ante* should be restored, and the parties should be placed in the position in which they were on the 28th day of May, 1907, namely, that the bankers, the defendants, should have their notes defaulted upon without any agreement to renew the same.

*Messrs. Vredenburg, Wall & Carey,* for the complainants.

*Mr. J. Floyd Clarke* (of the New York bar), of counsel with the defendant Lake Superior Corporation.

*Messrs. McCarter & English,* for all the other defendants.

GARRISON, V. C.

The Lake Superior Corporation is the successor of a previous corporation termed the Consolidated Lake Superior Company. It is the owner of a large plant at Sault Ste. Marie. The original corporation, the consolidated company, got into financial difficulties, and in 1904 was reorganized, and the present company succeeded to it. In the reorganization the Canadian Improvement Company, the complainant herein, was the underwriter. In the course of its underwriting it borrowed some five millions of dollars. For a portion of the money it procured a guaranty from

the government of the province of Ontario. For the money borrowed at Philadelphia it gave its notes accompanied by fifty thousand shares of stock of the Lake Superior Corporation as collateral.

The notes guaranteed by the province of Ontario came due on the 1st of April, 1907. The notes at Philadelphia (and elsewhere, although always treated by the parties as and called by them "the Philadelphia loans") came due on the 28th day of May, 1907.

In the latter part of the month of March, 1907, the complainant company sought to renew its notes in Canada for a year, and to obtain a continuance of the government guaranty. At this time the board of directors of the Canadian Improvement Company consisted of seven, namely, Orvis, Terry, Jr., Terry, Sr., Clergue, Moore, Hinchman and Hobby, Orvis being president and Terry, Jr., secretary and treasurer. Messrs. Orvis and Clergue were at Toronto around the 24th and 25th of March, 1907, endeavoring to effect a settlement of these questions with the provincial government. In the course of their negotiations the provincial treasurer wrote a letter to the treasurer of the complainant company as follows:

"TORONTO, March 25, 1907.

"*John T. Terry, Jr., Esq., Treasurer, The Canadian Improvement Co.,*
*100 Broadway, New York, N. Y.:*

"DEAR SIR—The Government of Ontario favorably considered the application of the Canadian Improvement Company for an extension of the Guarantee of the loan of that Company for $1,000,000 which is secured by various stocks and bonds, including a special lien upon the Algona Central and Hudson Bay Railway and the Manitoulin and North Shore Railway, which loan falls due on the 1st of April, 1907.

"But the Government desires, that you procure an Agreement of the various creditors of your Company whose loans mature May 28th, and June 1st, 1907, to an extension of their loans.

"As the Government understands that provision for the payment of these loans cannot be made in the present state of the money market, they are willing to assist by making this renewal of the Guarantee, but it is evident that the object of Government in such renewal, namely, to aid the safe establishment of the important industries at Sault Ste. Marie, would be defeated if renewal of these loans should be refused at their maturity.

"Yours faithfully,
"A. J. MATHESON,
"*Provincial Treasurer.*"

Taking this letter with them, Messrs. Clergue and Terry went to Philadelphia to negotiate with the Philadelphia bankers for an extension of the loan falling due on the 28th of May, 1907. A Mr. Rowell, a member of the bar of Toronto, was also retained by the complainant company to go to Philadelphia in this same matter.

J. Tatnall Lea, the president of a Philadelphia bank, and Francis B. Reeves, also the president of a Philadelphia bank, were two of the directors of the Lake Superior Corporation, having been elected to look after the large interests of those who had loaned money to the improvement company in its underwriting of the Lake Superior Corporation.

A meeting was had at Philadelphia on the 26th day of March, 1907, between Mr. Terry, Jr., Mr. Rowell and•Mr. Clergue on behalf of the Canadian Improvement Company, and Messrs. Lea and Reeves.

Either the letter from the provincial treasurer, above quoted, was shown to Lea and Reeves, or its contents were stated to them, and they were requested to agree to an extension of the loans falling due on the 28th of May, 1907, for the period of one year. They at first suggested that they would not contemplate an extension unless twenty per cent. of the face of the notes was paid on account. Subsequently, this amount was reduced to ten per cent. Those acting on behalf of the Canadian Improvement Company stated that they had no authority to agree to any cash payment, and would have to go back to headquarters to obtain the same. Before a final separation on that night Mr. Lea stated to Mr. Clergue, in a conversation held between them apart from the others, that the Philadelphia parties were entitled to four directors in the Lake Superior Corporation under the understanding between them, and that he would not advocate any renewal of the loans falling due on the 28th of May, 1907, unless the right to vote upon the pledged stock was expressly guaranteed to the pledgees.

Without now deciding what weight is to be given to the fixed impression that I have, I will state that I find that at that time the purpose of Mr. Lea, in insisting upon the voting power, was

so as to insure the election of the four directors to which he claimed the Philadelphia parties were entitled.

Nothing was determined upon whatever at this meeting, and Clergue, Rowell and Terry, Jr., returned to New York, where the office of the Canadian Improvement Company was.

The next morning, in the course of a telephone conversation, Mr. Lea renewed his insistment concerning the lodging of voting power upon the stock in the pledgees thereof, and that night, namely, the 27th of March, 1907, Mr. Rowell returned to Philadelphia and spent the evening with Mr. Lea, endeavoring to get him to recede from the position which he had taken concerning the immediate displacement of two directors so that two more, together with himself and Reeves, might be upon the board of the Lake Superior Corporation as the four directors to which the Philadelphia parties claimed they were entitled and the express power to vote upon the pledged stock.

Mr. Clergue reported to Mr. Orvis concerning Mr. Lea's demands, and also, I think it is clear, talked with the Terrys concerning the same. It is not proven that he was given any express authority to accede, nor is it proven that he was expressly directed not to accede.

Mr. Rowell failed in his attempt to get Mr. Lea to recede from his demands, and the attorney for the banks, Mr. Fletcher, was directed upon the morning of the 28th of March, 1907, to prepare a written agreement expressive of the understanding between the parties. It was stated to Mr. Fletcher that it was the desire of Mr. Clergue, acting on behalf of the improvement company, that any agreement concerning the number of directors to which the Philadelphia party should be entitled and the voting power upon the stock should be separate from the paper containing the renewal agreement to be signed by the various banks. Two papers were therefore prepared by Mr. Fletcher, assisted by Mr. Rowell, acting for the improvement company. They were dated March 27th, 1907, although prepared upon the 28th of March. These two papers were taken by Mr. Rowell to the bank of which Mr. Lea was president, where, upon the morning of March 28th, were gathered Mr. Lea, Mr. Clergue and Mr. Rowell. Mr. Rowell ex-

plained to Mr. Clergue that he had failed to get Mr. Lea to recede from the demands, and that the agreement as Mr. Lea was willing to assent to it was represented by the two papers above mentioned.

Up to this point I think there is little or no conflict in the testimony of the respective witnesses. But as to just what happened at the time these papers were presented there is dispute.

I shall not quote from the testimony, but shall state my findings of fact. I find that when these papers were presented to Clergue and he was informed that they represented that to which Mr. Lea would assent and would advocate the acceptance by the other banks, he stated that he had authority to close the matter, and signed the paper containing the conditions concerning the directors and the voting power. Throughout the case this has been called "the Clergue letter," and is as follows:

"*J. Tatnall Lea, Esq., Pres., First National Bank, 315 Chestnut St., Phila.:*

"DEAR SIR—In consideration of your bank signing the agreement, a true copy of which is hereto annexed, and of the other holders of notes referred to in said agreement signing the same to the extent in said agreement mentioned, the Canadian Improvement Company agrees forthwith, and in any event before the 28th day of May, 1907.

"I. To cause to be transferred into the names of the parties signing the said agreement, or their nominees, the stock pledged with them respectively as collateral security for the payment of the promissory notes of the Canadian Improvement Company held by them respectively, and to cause to be inserted in such transfers on the books of The Lake Superior Corporation an express power to the respective pledgees to vote thereon.

"II. To procure the resignation of two of the present directors of The Lake Superior Corporation, and to cause the vacancies created thereby to be filled by persons nominated by the Philadelphia bankers signing the said agreement.

"The word 'bankers' herein shall be deemed to include all the financial institutions executing the said agreement.

"The Canadian Improvement Company further agrees to execute and do all such further assurances and things as shall reasonably be required by the parties signing said agreement to give them the full benefit of this agreement.

"It is expressly understood and agreed that unless the above conditions are complied with the said agreement for extension, a true copy of which is hereto annexed, shall be null and void.

"Yours very truly,

"THE CANADIAN IMPROVEMENT CO.,

"By *F. H. Clergue.*

"Philadelphia. March 27th, 1907."

16

After it was signed Mr. Rowell suggested that it would perhaps be better if it were also signed by Mr. Orvis as president of the company, and should have the seal of the company placed upon it; there was also a suggestion that it would be well to have it ratified by the formal vote of the directors of the company. At any rate, the letter itself, after it was signed, was given by Mr. Lea to Mr. Rowell for the purpose of having him take it back to New York, to have some one of these things done with it by or on behalf of the improvement company.

Immediately after the Clergue letter was signed the parties busied themselves with getting the signature of the various pledgees or lenders to the renewal agreement, so-called, which is as follows:

"*In consideration* of the Government of the Province of Ontario extending the time for payment of the one million dollar ($1,000,000) loan due by the Canadian Improvement Company on the first day of April A. D. 1907 and guaranteed by the said government, *we, the undersigned*, being severally the holders of promissory notes of the said Canadian Improvement Company bearing date the 28th day of May, A. D. 1904 and payable three years after date for the amounts set opposite our respective names hereunder, severally covenant and agree with the Canadian Improvement Company that on payment to us respectively of ten per cent. (10 %) of the face amount of our said respective notes on the date when the said notes fall due, together with all interest then due thereon, we will renew the said promissory notes for the balance, or ninety per cent. (90 %) of the face amount thereof, for the period of one year from the said 28th day of May, A. D. 1907, the renewal notes to be in the same form, to bear the same rate of interest, and to be secured by the same collaterals as the notes now current.

"This agreement not to be binding on the undersigned unless signed by the holders of notes of the Canadian Improvement Company falling due on the said 28th day of May, A. D. 1907, holding at least ninety per cent. (90 %) of the total amount of said notes. Time to be of the essence of this agreement.

"Dated at Philadelphia this 27th day of March, A. D. 1907."

Endeavors to get signatures to this agreement continued for a long time. The Ontario government did make its renewal of guaranty on the 1st of April, 1907. Along in May, 1907, the improvement company found itself unable to raise sufficient money to pay the ten per cent. provided for in the above-quoted renewal agreement. It thereupon sent Mr. Clergue to Philadelphia to secure a change in that term of the above agreement.

This he accomplished, and a new paper was drawn up, which, as will be seen, only varies from the first paper by substituting additional collateral for cash and by striking out the provision for ninety per cent., signing and requiring the signatures of all creditors, and by eliminating the statement that time is of the essence.

The latter paper is as follows:

"In consideration of the Government of the Province of Ontario extending the time for payment of the one million dollar ($1,000,000) loan due by the Canadian Improvement Company on the first day of April, A. D. 1907, and guaranteed by the said Government, we, the undersigned, being severally the holders of promissory notes of the said Canadian Improvement Company bearing date the 28th day of May, A. D. 1904, and payable three years after date for the amounts set opposite our respective names hereunder, severally covenant and agree with the Canadian Improvement Company that on delivery to us respectively on the date when said notes fall due, of an amount in first mortgage and collateral trust bonds of the Lake Superior Corporation equal at ninety per cent. (90 %) of their face value, to ten per cent. (10 %) of the amount of our respective notes as additional security for the payment of the indebtedness evidenced by said notes, and on payment to us respectively on the first day of June, 1907, of all interest then due on our said respective notes, we will renew the said promissory notes for the period of one year from the said 28th day of May, A. D. 1907, the renewal notes to be in the same form, to bear the same rate of interest, and to be secured by the same collateral as the notes now current, and in addition thereto the said bonds provided to be delivered on the date when said notes fall due.

"This agreement not to be binding on the undersigned unless signed by all the holders of notes of the Canadian Improvement Company falling due on the said 28th day of May, A. D. 1907.

"Dated at Philadelphia, this 21st day of May, A. D. 1907.

"*Witness.*                *Name.*                *Amount.*"

This paper was signed by all of the parties in interest, and on the 28th day of May, 1907, the additional collateral and the new notes were tendered by the improvement company and accepted by the banks, and the old notes surrendered by the banks to the improvement company.

The theory of the draftsman of the bill of complaint evidently was that, since ninety per cent. of the note holders in question did not sign the agreement dated March 27th, 1907, the contemporaneously signed paper termed the Clergue letter was inoperative because it was so integrally a part of the March 27th paper that it fell with it. I cannot agree with this con-

tention. I think it perfectly evident from all of the testimony and the written papers that it was clearly understood between the parties who were carrying on the negotiation that the extension asked for would only be granted if the demands made on behalf of the Philadelphia bankers were met. Those demands were incorporated in what has been termed the Clergue letter. That letter, it is true, refers in terms to the agreement dated March 27th, 1907. But, in my view, what was afterwards done was nothing more than changing certain terms of the March 27th, 1907, agreement, and the rest of the agreement stood as theretofore. In my opinion the case must be viewed as if all of the terms of the agreement were stated on one piece of paper, which, at first, was dated March 27th, 1907, and afterwards this identical piece of paper had erased from it certain terms and others inserted in their place.

It is necessary, therefore, to take up the consideration of the matter as if the agreement dated May 21st, 1907, and the so-called Clergue letter were one document.

Viewed in this light, the first question to be determined is, whether they constitute an agreement binding upon the Canadian Improvement Company. It is not pretended by anyone that the company itself, by the formal action of its board of directors, ever either authorized the contract or ratified it. When Mr. Clergue and Mr. Rowell returned to New York on the evening of the 28th of March, 1907, they had with them—or rather Rowell had—the Clergue letter. On the next morning the letter itself was shown to the Terrys, senior and junior, and its contents were disclosed to Mr. Orvis. The testimony shows that Mr. Orvis violently opposed the carrying out of the terms of the letter, as did also the Terrys. Mr. Rowell returned the letter to Mr. Lea, writing as follows:

"As requested, I beg to hand you herewith seven (7) copies of the Agreement as executed in Phila. yesterday, for the different Banks and Trust Companies executing same. I also enclose seven (7) copies of Mr. Clergue's letter for the different banks and Trust Companies.

"I find that we overlooked yesterday the Franklin Bank, and I have this day phoned Mr. Fletcher to speak to you about obtaining their signature to the Agreement. I presume that there will be no difficulty in obtaining this.

"Mr. Clergue was not able to arrange for a Meeting of the Directors of the Improvement Company to-day, to formally ratify the letter signed yesterday on behalf of the Canadian Imp. Company, and as he is leaving to-night for Toronto, the matter will have to stand over for a few days. I therefore return the original herewith, as signed by Mr. Clergue, together with further letter from Mr. Clergue, in which he promises to have the letter formally ratified at the earliest practicable date. All the New York people have signed, except Mr. McHarg, who is out of the city, but Mr. Clergue is to reach him by Telegraph.

"Kuhn, Loeb & Co., however, exacted as a condition of their signature, that all the note holders should sign, and they endorsed this on the face of the agreement. Under these circumstances it becomes necessary to have all the Philadelphians—including the small ones—execute the agreement.

"I was pleased to hear from Mr. Fletcher of the very satisfactory progress he had made; he expects to close up the matter with you to-morrow forenoon.

"Yours very truly,

"N. W. ROWELL.

"P. S.—Did not have time make copies Mr. Clergue's letter. N. W. R."

and Mr. Clergue on the same day also wrote to Mr. Lea as follows:

"I find that it will be impossible to arrange for a meeting of the directors of the Canadian Improvement Company before I leave the city, to formally ratify the letter I gave you yesterday on behalf of the Improvement Company In re Extension of the Improvement Company Loans, but I will have the letter formally ratified at the earliest practicable date.

"As the Extension agreement was handed over by you on the terms of a letter signed by me, unless the letter is formally ratified by the Improvement Company, and the terms therein duly carried out, the Extension Agreement, of course, does not go into effect."

It is the contention of the complainants that since no ratification ever was had, the defendants must be presumed to have acted without reliance upon the provisions of the Clergue letter, and to have made the renewals upon other considerations and without the right to avail themselves of the consideration contained in that letter.

The force of any decision so much depends upon the construction to be placed upon the letter if viewed as a contract that I think it useful to take up the consideration of that question before determining the other.

Broadly speaking, there are two views to be considered.

One view is that, by the terms of this paper, the improvement company bound itself to displace two directors and replace them with nominees of the Philadelphia bankers and to give an express power to vote to the pledgees of the stock, provided the banks should renew the notes.

The other view is that the Canadian company secured from the banks what might be termed an option to renew, so that if the improvement company should displace two directors in the Lake Superior Corporation and should give them the voting power, then the banks would be bound to renew the notes.

The reasonableness of considering the construction of the Clergue letter first will be seen because if the latter construction is found to be the true one, then, of course, it is utterly immaterial whether the improvement company ever authorized or ratified the contract or agreement contained in the Clergue letter, or shall be held to be estopped with respect to it, because, if the whole thing were tentative and optional, the improvement company could do as it chose and would only be bound in case it acted by displacing the directors and giving the voting power.

I am clearly of opinion that it was the intention of the negotiating parties concerning this most important matter that the power to determine whether a renewal should be had or not rested with the banks, who were not to be bound to renew unless upon the date of the maturity of the notes to be renewed, the improvement company had completely carried out its obligations. The question, however, is whether, failing to insist upon the execution by the improvement company, of its obligations, and renewing without obtaining fulfillment of the same, the banks have now lost, or, perhaps more correctly stated, after the renewal never had the right to insist upon the fulfillment thereof.

The case was argued with thoroughness and ability by the various counsel, but no one of them furnished the court with any authority the facts of which so nearly resembled those in this case as to make the principle applied at all useful. It will have to be considered, therefore, rather in the light of reason than of authority. Viewed thus, it seems to me that the proper finding of the relations of the parties is as follows: The im-

provement company, being urgently desirous of securing an agreement to extend the loans maturing May 28th, in the month of March, 1907, so as to aid them in procuring an extension of the guaranty of the provincial government of the loan falling due there April 1st, 1907, secures from the banks or their representatives, signatures to an agreement based upon certain considerations, among them the having of two additional directors and the giving of a voting power upon the stock deposited as collateral. While it was within the power of the banks to have insisted upon the fulfillment of these obligations before the maturity of the notes of May 28th, 1907, and the renewal thereof, they did not lose that right by renewing without insisting. It was one of the considerations upon which the renewal was procured. Its performance may therefore be insisted upon by those in favor of whom the consideration ran.

If what was done and written between the parties is to be treated as a contract made by an agent on behalf of a principal, then I think the utmost right of the improvement company is to either accept the contract in its entirety and be obligated to carry it out; or, if it stands upon the ground that it did not know, at the time that it partially performed the contract, what the terms made by its agent were, and has not ratified the same, then its right is to repudiate the contract in its entirety and restore the other party to the position in which it was before any attempted change was made.

I think it undoubtedly true that the Philadelphia bankers were induced to make the renewal because they believed that the written papers gave them certain considerations, namely, the additional collateral, the two additional directors, and the power to vote upon the stock. I do not find that they were required by any principle of law to insist upon the performance of the consideration; and I find that they have the right—viewing what was done and written as a contract—to perform their part as they have done, and call upon the other party to perform its part. This, as I have just said, is so if it is viewed as a contract.

If, on the other hand, the improvement company makes good its contention that it did not know all of the terms agreed upon by its agent assuming to act on its behalf, then the utmost limit·

to which it is entitled to rights, as I find, is to repudiate the contract in its entirety and restore the status which existed at the time that the attempted change was made.

The embarrassment in which I would find myself in determining the question of ratification by other than formal action, or by estoppel, if that be the more correct term to apply to the situation, is, I think, relieved by the action of the defendants in their cross-bill. It is proven beyond question that, of the seven directors of the improvement company, four at least, Clergue, Orvis and the two Terrys, knew of the agreement signed by Clergue on behalf of the improvement company; and, in face of this knowledge, they, on the 28th of May, 1907, did renew the notes and secured the benefit thereof. To adopt the view contended for by the complainants it would be necessary to find that the contract for renewal was made on the day of the renewal, or was made on the 21st day of May, 1907, the day of the last-signed paper. But, in my view, this is not a correct inference from the facts. I think it clear that the renewal was in consideration of the extension by the provincial government of its guaranty, of the receipt of cash or securities, of the concession of two additional directors, and the right to vote upon the stock; that some of these terms were fixed in the first negotiation and set down in the first written paper, which was varied later, at the request of the improvement company, by eliminating the cash and substituting the additional collateral in its place; but that the provisions in the Clergue letter were settled as consideration moving to the banks, and were part of the transaction.

I am of opinion that one circumstanced as this complainant company was may not retain the fruits of a contract made on its behalf by an agent without fulfilling all of the obligations on its part assumed on its behalf by the same agent in the same negotiation. Whether the improvement company has proven in this suit that it is not to be held to have ratified the agreement made on its behalf by Clergue, or to be estopped to deny it, is as I have before said, not necessary for me to determine, because, the defendants by their cross-bill, have offered to agree to a mutual rescission of the contract, or to act as if there were no contract and have the *status quo ante* restored. This latter is the utmost limit

of what I find the complainants would be entitled to under the circumstances.

My conclusion is that the improvement company must elect either to repudiate the entire contract and restore the *status quo ante*—that is, give back the old notes, which would then be due as of the 28th of May, 1907, and receive back the additional collateral deposited with the pledgees; or to be bound to carry out the terms of the Clergue letter by giving the two additional directors to the defendants and giving them an express power to vote on the stock.

With respect to this express power the defendants have again limited themselves by an offer made in open court that the court shall restrict their right to vote thereon to the question of directors, so that they may not use the power to vote for any other purpose than in the election of the directors.

In my view it will not be necessary to issue a mandatory injunction under the cross-bill requiring the complainants to give to the defendants an express power to vote upon the stock. This is so because of the situation existing at the time of the filing of the bill, which situation also, I think, reinforces the conclusions arrived at and stated by me above. It will be recalled that at the time of the filing of the bill the stock in question had been transferred upon the books of the Lake Superior Corporation to the defendants by force of powers of attorney duly signed by the holders of the stock.

Under our statute, section 40 (*P. L. 1896 p. 290 § 37*), this indisputably vested the voting power in the defendants. The complainants seek an injunction to prevent the defendants from voting upon the stock, the legal title to which is thus vested in them, and contend that by virtue of the thirty-seventh section of our Corporation act they are entitled to such injunction. So much of that section as is relevant reads as follows:

"* * * Every person who shall pledge his stock as collateral security may, nevertheless, represent the same at all such meetings, and may vote thereon as a stockholder, unless in the transfer to the pledgee on the books of the corporation he shall have expressly empowered the pledgee to vote thereon, in which case only the pledgee or his proxy may represent said stock and vote thereon."

I think this statute was intended to apply to cases in which the stock was transferred to one as "pledgee," or, at least, to cases in which the transfer gave notice to the corporation that the transferee was a pledgee. Certainly, as between the corporation and the parties, the corporation was not intended by this statute to have the burden cast upon it of determining the question, as between the parties, as to whether the transfer was in pledge or not. The duty of the corporation is to recognize the registered holder shown on its transfer books.

As was said in the case of *Argus Printing Company, 12 L. R. A. 781:* "It would indeed be a startling doctrine that 'the legality of business transacted at stockholders' meetings should be subject to the ultimate decision of complicated questions arising between different claimants of the same stock.'"

In the same case it is clearly pointed out that the right of a pledgeor to vote upon stock, the legal title to which is vested in his pledgee, must be obtained by application to a court of equity for a proxy, and that court, if it finds that the pledgee is under an obligation to give a proxy, will so decree.

It will be seen, therefore, that the situation existing at the time of the filing of this bill was such that the defendants had the right to vote upon this stock unless there was some agreement or some legal or equitable reason why the complainants, the pledgeors, should have this right. I do not find that the complainants have proven any legal or equitable right to compel the defendants to give them a proxy, even if they had prayed for that relief, nor do I find that they have sustained the burden of showing any equitable reason why an injunction should issue to restrain the defendants from exercising the right to vote upon the stock the legal title to which is vested in them.

The terms of the decree may be settled upon notice.