THOMAS W. WILSON *vs.* GEORGE E. HAYES and others.

May 24, 1889.

**Mortgage — Redemption from Foreclosure Sale — Papers to be Produced to Sheriff—"Assignments."** — Where a mortgagee sells the note, but executes no assignment of the mortgage securing the same, and subsequently repurchases the note, the equitable transfers of the beneficial interest in the mortgage, effected by the sale and repurchase of the debt, are not "assignments," within the meaning of Gen. St. 1878, c. 81, § 14, which the mortgagee is required to produce to the person or officer from whom he proposes to redeem.

**Same—Statute as to Filing of Documents—Who may Take Advantage of Omission.**—The statute (Laws 1881, Ex. Sess. c. 3) requiring a party redeeming to file within 24 hours the documents produced to the person or officer from whom the redemption is made, being intended for the benefit of subsequent redemptioners, they alone, if any one, can take advantage of an omission to comply with its provisions.

**Alteration of Instruments—Presumption — Burden of Proof.**—Where an interlineation or erasure is apparent upon the face of an instrument, the presumption of law is that it is a legitimate part of the instrument, and was made prior to its execution, and the burden is upon the maker to show that it was altered after delivery. The proof or admission of the signature of the maker is *prima facie* evidence that the instrument written over it is his act, and this will stand as binding proof, unless the maker can rebut it by evidence that the alteration was made after delivery. When, by whom, and with what intent, the alteration was made, should be submitted to the jury as questions of fact upon all the evidence, both intrinsic and extrinsic.

**Alteration of Negotiable Notes.**—The same rule applies to negotiable promissory notes as to other instruments.

**Same — Fraudulent Alteration by Holder — Subsequent Assent of Maker.**—Where the holder of a promissory note makes a fraudulent alteration, amounting in law to a forgery, destroying the instrument and extinguishing the debt, a subsequent assent by the maker to such alteration, without any new consideration, will not create any liability upon the note as altered in favor of the holder who made the fraudulent alteration.

This action was brought in the district court for Crow Wing county, and was tried by *Sleeper*, J.; certain issues as to the fact, time, etc., of the alteration of the note mentioned in the opinion being submitted to a jury. Plaintiff appeals from an order by *Holland*, J., refusing a new trial.

*Noyes & McGee*, for appellant.

*Ueland, Shores & Holt* and *Levi E. Lum*, for respondents.

MITCHELL, J. On August 27, 1885, plaintiff loaned to defendant Douglas $5,000, for which the latter executed his promissory note, secured by a mortgage on certain real estate upon which he had executed a prior mortgage to the Minneapolis Loan & Trust Company. It had been previously agreed between plaintiff and Douglas that plaintiff was "to take an assignment" of the prior mortgage, and that Douglas should have three years in which to redeem the property. In September, 1885, Wilson indorsed and sold Douglas's note to the Bank of Minneapolis, but made no formal assignment of the mortgage. Wilson not having obtained any assignment of the Loan & Trust Company's mortgage, and default having been made in its conditions, the company foreclosed and bid in the property on the 23d of July, 1887, and subsequently transferred the certificate of sale to defendant Hayes, who was a judgment creditor of Douglas, junior to both mortgages. Shortly before the expiration of the time of redemption, Wilson applied to Hayes for an assignment of the certificate of sale, which the latter refused to give. Thereupon Wilson repurchased Douglas's note from the Bank of Minneapolis, filed his intention to redeem as mortgagee, and on July 25, 1888, presented to the sheriff who made the sale his mortgage and the affidavit required by statute, and tendered the proper amount of money, and demanded a certificate of redemption. The sheriff, at the instance and direction of Douglas and Hayes, refused to accept the money or allow plaintiff to redeem. Hayes now claims to own the property under the foreclosure of the trust company mortgage. Plaintiff brings this action to enforce his right of redemption.

Defendants first deny Wilson's right to redeem, on the ground of his alleged failure to comply with the requirements of statute. They urge that, inasmuch as the statute requires a redemptioner to pro-

duce to the sheriff "any assignments necessary to establish his claim," and as a transfer of the debt operates as an equitable assignment of the mortgage security, therefore Wilson ought to have presented to the sheriff whatever evidenced the transfer by him to the bank, and the retransfer by it to him. There is nothing in this point. The object of the statute is to require the production to the sheriff of assignments constituting the redemptioner's chain of title, and necessary to show his ownership of the mortgage or other lien under which he claims the right to redeem. In the present case the mortgage · stood in Wilson's name all the time; and, while the transfer of the note carried with it equitably all beneficial interest in the mortgage, yet upon Wilson's taking up the note from the bank he was placed *in statu quo*, and again became the equitable as well as the legal holder of the mortgage. It would be absurd to require him to produce assignments which in fact never existed.

It is also claimed that Wilson lost his right to redeem because he did not, within 24 hours after his tender and demand, cause the documents produced to the sheriff to be filed in the office of the register of deeds, as provided by Gen. St. 1878, *c*. 81, § 14; Laws 1881, Ex. Sess. *c*. 3. Without stopping to consider what will be the effect of a failure to comply with this statute, it seems to us that it may at least admit of doubt whether it is applicable to a case like the present, where upon tender and demand a redemption is not permitted. But, at any rate, as it is intended for the benefit and protection of junior redemptioners, they alone, if any one, can take advantage of a non-compliance with its provisions.

Plaintiff's right to redeem is also denied because he never obtained an assignment of the trust company's mortgage, as he had agreed with Douglas to do. Conceding that he was guilty of a breach of contract in not doing so, we fail to see how that is any cause for refusing him the right to redeem in order to protect his own mortgage. Hayes certainly has no right, either as assignee of the trust company or as judgment creditor of Douglas. to set up any such thing. He was no party to this contract, nor was it made for his benefit; and whatever other remedy Douglas might have, he cannot assert any such thing against plaintiff's right to redeem. In the first place, his

own right of redemption, and consequently all his interest in the property, was gone. In the next place, he could not be benefited, but would in fact be damaged, by preventing plaintiff from redeeming, for his debt to plaintiff would still exist to its full amount; whereas, if a redemption were had, the debt would be satisfied to the extent of the value of the property over the amount paid to redeem. And, if plaintiff had redeemed, equity would still treat him as trustee for Douglas to the extent necessary to protect his rights under the contract. Therefore a redemption, so far from being in conflict with plaintiff's obligations to Douglas, would have been in the line of their performance.

The last and principal defence is that Wilson fraudulently altered the note secured by the mortgage, after its execution, by erasing the word "annually" and inserting the word "quarterly," so as to make the interest payable quarter-yearly instead of yearly, thereby destroying the instrument and extinguishing the debt. Plaintiff interposed a reply putting in issue the alteration, and further alleging (as we may fairly construe it, in the absence of any specific objection to the pleading) that Douglas had ratified the note in its present condition by paying interest on it, with full knowledge of all the facts. Upon this issue as to the alteration of the note the court submitted certain questions to the jury, their answers to which were in substance that the note was altered after its execution, without the knowledge or consent of Douglas, by some one to the jury unknown, but by and with the knowledge and authority of Wilson. Without considering whether the evidence warranted these findings, it is enough to say that it was such that the jury might have found the other way. The erasure and interlineation constituting the alleged alteration are apparent upon the face of the instrument upon inspection, and are in a different colored ink from the remainder of the written portion of the note.

The court, at the request of defendants, and against plaintiff's objection, instructed the jury that in the absence of any evidence as to when the alteration was made, it would be their duty to find that it was made after delivery; that such was the presumption of law, in the absence of explanation; and that the burden of proof was upon

plaintiff, as holder, to show that it was made before execution.   This
instruction, in various forms, was repeated and emphasized, and is
here assigned as error. | The question of presumption and burden of
proof, where interlineations or erasures appear on the face of an in-
strument, is one upon which there is a wilderness of authorities and
much conflict of opinion. | Any attempt to cite or consider the innu-
merable cases on this question would be both impracticable and
useless.   The rule adopted by some authorities is that the presump-
tion, in the absence of evidence to the contrary, is that the altera-
tion was made before execution, and therefore that no explanation
is required in the first instance; while others hold, in accordance
with the instruction of the trial court in this case, that the pre-
sumption of law is that the alteration was made after delivery, and
therefore the burden is upon the holder to explain it, and show that
it was made under circumstances that would not invalidate the in-
strument.   In addition to these two leading and opposing views, dif-
ferent courts have adopted certain intermediate or compromise rules,
none of which need be here referred to, except one, seemingly adopted
by some very eminent courts, to wit, that the alteration raises a pre-
sumption against the instrument when it is suspicious; otherwise,
not.   But this furnishes no definite rule by which to determine when
the burden is upon the holder to explain the alteration and when it
is not.   Who is to determine, and by what test, whether the altera-
tion is suspicious?   And, if held suspicious, when must it be ex-
plained,—before or after it is admitted in evidence?   Evidence as to
when, by whom, and with what intent, an alteration was made may
be one or both of two kinds, extrinsic or intrinsic; the latter being
that furnished by the inspection of the instrument itself, such as its
appearance, the nature of the alteration, etc.   These things, consid-
ered in connection with the relation of the parties to the instrument,
may often constitute important evidence.   And it seems to us that
the rule just referred to amounts to nothing more than saying that
in some cases this intrinsic evidence may tend to prove that the alter-
ation was made after delivery, and therefore throw the preponderance
on that side, unless the holder of the instrument produces extrinsic
rebutting evidence.   Thus construed, we would find no special fault

with the rule.    But it is incorrect to call this a presumption of law, it is simply an inference of fact drawn from evidence in the case.

The doctrine that the presumption of law is that the alteration was made after delivery, and that the burden is on the holder in the first instance to explain it, seems to us to be unsound as well as harsh. Presumptions of law, if indulged in, should be in favor of innocence rather than guilt.    Moreover, all disputable presumptions of law are based upon the experienced course of human conduct and affairs, and are but the result of the general experience of a connection between certain facts; the one being usually found to be the companion or effect of the other.    Hence such presumptions ought to be conformable to the experience of mankind, and the inferences which, in the light of that experience, men would naturally draw from a given state of facts.    Now, it is a matter of common knowledge that at the present day every man is to a certain extent his own lawyer, and that laymen frequently draw their own contracts, without much regard to form, in which erasures and interlineations are the rule rather than the exception.    Indeed, the same thing is unfortunately true of many instruments which come from the hands of lawyers.    It is also a matter of common knowledge that printed blanks are now in general use for almost all kinds of contracts, and that it is the common practice, even with many lawyers, in case the blank does not conform to the actual agreement of the parties, to erase and interline, without making any notation that this was done before execution.    Whatever might have been the fact formerly, when but few men could write, and when contracts were usually drawn by skilled conveyancers or scriveners, with great care and wholly in their own proper handwriting, the rule under consideration is wholly unsuited to the business habits or usages of this country at the present day.    The mere existence of an interlineation or erasure in an instrument would not naturally or ordinarily produce an inference in the minds of men that it had been fraudulently altered after execution.    Indeed, unless the alteration was of such a suspicious character as to furnish intrinsic evidence to the contrary, we think the natural inference would be that it was a legitimate part of the instrument, and was made at or before its execution.    We are therefore of opinion that the correct rule is

that the burden is upon the maker to show that the alteration was made after delivery; or, perhaps, to state the proposition with more precision, the proof or admission of a signature of a party to an instrument is *prima facie* evidence that the instrument written over it is his act, and this *prima facie* evidence will stand as binding proof, unless the maker can rebut it by showing by evidence that the alteration was made after delivery; and that the question when, by whom, and with what intent, the alteration was made, is one of fact, to be submitted to the jury upon the whole evidence, intrinsic and extrinsic.

Many authorities, however, while admitting that the general rule is that the law presumes that an alteration in an instrument is a legitimate part of it until the contrary appears, hold that this rule does not extend to negotiable securities. Most of the text-books seem to lay this down as the law, but at the same time admit that the opposite view has the sanction of eminent judicial authority. The reasons usually assigned for applying to negotiable paper a rule different from that applied to other instruments are, substantially and briefly, two: *First.* As notes and bills are intended for negotiation, and as payees would not receive them when clogged with impediments to their circulation, there is a presumption that such an instrument starts fair and untarnished, which stands until it is repelled. *Second.* That, without such a presumption to sustain him, the maker would be defenceless, as he cannot be expected to account for what happened after the paper left his hands. The first of these reasons, it seems to us, rather begs the question; and, whatever force it might have possessed in times when the use of so-called negotiable instruments was confined to strictly commercial paper, it can have but little weight now, when such instruments are taken and given by all classes of people, in the most informal manner, as mere evidences of indebtedness, and without reference to their subsequent negotiation. Most of what we have suggested on this point is equally applicable to promissory notes. The second reason might have had much force when parties were not competent witnesses, but very little now, when they may testify in their own behalf. No one can better know than the maker what condition an instrument was in when

it left his hands. We can see no good reason in principle why any distinction in this regard should be made between negotiable paper and other instruments, and the tendency of many of the late American authorities is to repudiate any such distinction. *Bailey* v. *Taylor*, 11 Conn. 531, (29 Am. Dec. 321;) *Hunt* v. *Gray*, 35 N. J. Law, 227; *Gooch* v. *Bryant*, 13 Me. 386; *Crabtree* v. *Clark*, 20 Me. 337; *Neil* v. *Case*, 25 Kan. 510. See, also, *Beaman* v. *Russell*, 20 Vt. 205, (49 Am. Dec. 775;) *Davis* v. *Jenney*, 1 Met. 221.

Our conclusion, therefore, is that the instruction of the court below was erroneous, and for that reason the order refusing a new trial must be reversed.

With reference to a new trial, it becomes proper to consider the effect of Douglas's so-called ratification of the alleged alteration. The court found that upon the discovery of it he denounced the alteration as fraudulent and unauthorized, and did not acquiesce therein. This is not justified by the evidence. While it appears that, upon being shown the note by the bank,—then the holder,— he asserted that it had been altered since he delivered it,, yet, so far from repudiating it, according to his own admissions, he repeatedly paid interest on it, voluntarily and without objection. If the alteration was capable of ratification, this would, according to all the authorities, amount to a ratification or adoption, whichever it may be called. If the alteration was a mere spoliation by a third party, or if made by the holder by mistake or accident, or innocently and without fraudulent intent, so that it did not destroy the note, or at least did not extinguish the debt of which it was the evidence, it would not invalidate or affect the mortgage, which can only be discharged by the payment or extinction of the debt secured by it. In such case the question of ratification would be wholly immaterial. But suppose the alteration was fraudulently made, amounting in law to a forgery. The question remains, could this be subsequently ratified by Douglas, so as to make the note in its altered form his contract?

The question whether a forgery is capable of being ratified, so as to create a liability on the forged instrument, in the absence of circumstances constituting an estoppel *in pais,* is one upon which there is almost as much conflict of authorities as upon that of burden of

proof and presumption, already considered. Some of the cases holding the negative of the question place the doctrine upon grounds of public policy; others, upon the ground that ratification involves the relation of agency, and that ratification can only be effectual when the act is done by the agent avowedly for or on account of the principal; that the very nature of ratification presupposes the act done for another, but without competent authority, and hence can have no application to a forgery, for a forger never acts or assumes to act for another; others put it upon the ground that, in the absence of any new consideration, the ratification or adoption of the forged instrument would be a mere *nudum pactum.* The cases holding a forgery capable of ratification take the ground that, so far as considerations of public policy are concerned, the ratification of forgeries should stand on the same footing as that of other contracts, and should be held valid, unless made in consideration of compounding the felony, or for some other illegal consideration; that as to the want of authority, it can make no difference whether the unauthorized act was or was not a forgery; that this want of authority is the very thing which the ratification cures, and to which the maxim applies, *Omnis ratihabitio retrotrahitur et mandato priori æquiparatur;* that the ratification is "dragged back and made equivalent to a prior command;" that a ratification is not a contract, but an adoption of one previously made in the name of the ratifying party, and requires no consideration. See *Brook* v. *Hook,* L. R. 6 Exch. 89, 98; *McHugh* v. *County of Schuylkill,* 67 Pa. St. 391; *Shisler* v. *Vandike,* 92 Pa. St. 447; *Owsley* v. *Philips,* 78 Ky. 517; *Ferry* v. *Taylor,* 33 Mo. 323, 334; *Workman* v. *Wright,* 33 Ohio St. 405; *Greenfield Bank* v. *Crafts,* 4 Allen, 447; *Wellington* v. *Jackson,* 121 Mass. 157; *Hefner* v. *Vandolah,* 62 Ill. 483; *Forsyth* v. *Day,* 46 Me. 176.

In the large majority of the cases usually cited in support of the proposition that a forgery can be ratified, it will be found that the question was presented in connection with circumstances creating an estoppel, or that there was in fact no fraudulent making or altering, but merely a lack of sufficient authority; and hence such cases are not in point. Where the ratification is made to a third party,—the holder of the instrument, who was not a party to the forgery,—we

are not called upon to decide whether or not such ratification would create a valid liability on the instrument. All the authorities cited by appellant to the effect that a forgery may be ratified are of this class. But we have found no case where it has been held that a forged instrument can be ratified so as to give the forger himself a right of action upon it. It is legally impossible in such a case that the relation of principal and agent could exist between the parties, for one man cannot be the agent of another to make a contract with himself. Hence it would seem that the doctrine of ratification can have no application to such a case. If the entire instrument was a forgery, in the popular sense, it would require no argument to prove that a mere assent to or ratification of it in the hands of the forger would be a mere *nudum pactum*. But in law there is no distinction between a forgery in making and a forgery by altering. The altered instrument is not the contract of the maker, and in legal contemplation is as entirely a forgery as the other. If the alteration was not fraudulent, so that it did not destroy the instrument, or at least did not extinguish the debt, we can see how a subsequent assent to it would create a liability on the instrument as altered. Parties can alter their contract by mutual consent, and this requires no new consideration, for it is merely the substitution of a new contract for the old one, and this is of itself a sufficient consideration for the new. And what a party may assent to when done he may assent to afterwards, so as to bind himself, if there be a consideration to support it. But where there has been a fraudulent alteration of a written contract, which not only destroys the instrument but extinguishes the debt, it seems to us clear on principle that a subsequent assent to the alteration, given to the party who made it, without any new consideration, is, in any view of the case, a mere naked promise. *McHugh* v. *County of Schuylkill, supra; Workman* v. *Wright, supra; Owsley* v. *Philips, supra.*

Order reversed.