MARJORIE T. STRADER v. DAN HALEY, *etc.,* AND OTHERS.[1]

December 31, 1943.

Nos. 33,571, 33,572, 33,573, 33,574, 33,575.

[1]Reported in 12 N. W. (2d) 608.

*R. Edison Barr,* for appellant.
*Mogren, O'Donnell & Harvey,* for respondent Dan Haley.
*W. H. Fallon,* for respondent Park Recreation Parlor, Inc.
*Mark H. Gehan,* for respondent Frank N. Lux.
*Smith & Sehm,* for respondent John Esslinger, Inc.

PETERSON, JUSTICE.

In four separate actions against the defendants other than the Liberty State Bank, plaintiff seeks to recover the amounts of checks the payment of which she claims was obtained by means of forgeries of her name as drawer or endorsee by the defendant Haley. In the case against the bank she asks for a declaratory judgment that the bank is liable to her for the amounts of certain of the checks paid by it and charged to her account. The five actions were tried together.

Between July 11, 1936, and June 14, 1941, 69 such checks aggregating $1,852.55 were negotiated by Haley. In the action against Haley as sole defendant, plaintiff claims that during July and

August 1936 Haley forged her name as a drawer on two checks dated July 11 and 13 respectively for $15 each payable to Haley; that he endorsed the checks; that he obtained cash therefor from one McBride or McBryan, to whom the checks were returned by the bank on account of insufficient funds and that, because of threats to prosecute her for issuing checks with insufficient funds, she paid them through her attorney, Charles N. Dohs.

In the actions against Haley and the defendants other than the bank, plaintiff seeks to recover the amounts paid on checks in which she was named as payee and upon which she claims her endorsement was forged. In the Lux case she also seeks to recover upon three checks aggregating $65 upon which she claims her signature both as drawer and endorsee was forged.

In the bank case as it stood at the time of trial, plaintiff sought a declaratory judgment that the three checks held by Lux, upon which she claimed her name was forged as drawer and endorsee, were forgeries and that the bank was liable for having paid the same under the forged signature and endorsement and that Lux was liable for having received payment thereunder from the bank. The checks were charged back to Lux by the bank, and Lux counterclaimed on them. So far as plaintiff's account with the bank was concerned, it stood as though the checks had never been charged to it.

Numerous defenses were interposed, including denials of plaintiff's claims, estoppel, ratification, and negligence on the part of plaintiff with respect to Haley's acts which defendants claimed prevented recovery. We deem it necessary to discuss only one of them, viz., ratification, because an affirmance upon that ground requires an affirmance in all the cases.

The first two checks—those cashed by McBryan—were cashed in July 1936. The next check, which was a dividend check payable to plaintiff, was cashed about six months afterwards, some time after February 1, 1937. During the year 1938, between January 17 and November 15, 11 checks were cashed at intervals varying from one-half to one and one-half months. In 1939, four checks were

cashed at intervals of one, three, and seven months. During 1940, 20 checks, and during 1941, 22 checks were cashed at intervals generally of one-half to a month. The checks varied in amount from $10 to $50. Park Recreation Parlor, Inc. cashed 31 checks of the face value of $555; Lux, 20 checks of the face value of $695; Esslinger, Incorporated, 7 checks of the face value of $330.55; and Liberty State Bank, 8 checks of the face value of $207.

During the greater portion of the period from 1936 until the latter part of September 1941, Haley and his wife lived with plaintiff in her home without charge or payment of rent. Plaintiff furnished their meals. Haley and his wife did some work about the house in payment therefor and served as companions for plaintiff. During all this time, income due to plaintiff was collected by Charles N. Dohs, her attorney, acting as her agent, and later R. Edison Barr, and paid to her directly at the rate of $100 per month to defray her household expenses with checks varying in amount from $10 to $50. These checks were delivered by mail. Plaintiff received many checks other than those here involved. It is undisputed that Haley at the specific instance and direction of plaintiff cashed most of those checks.

Plaintiff's claim and her testimony in support thereof are to the effect that her name was forged on all the checks in dispute; that by means of the forged signatures Haley negotiated the checks and obtained payment thereof; and that he converted the proceeds of the checks to his own use. She claims that he obtained possession of the checks in dispute in which she was named as payee without her knowledge and consent and forged endorsements thereon for the purpose of negotiating them.

The evidence for defendants is to the effect that the checks in dispute, the same as the others, were endorsed by plaintiff as payee; that she delivered them to Haley so endorsed with directions to cash them, to purchase groceries, liquor, and beer for her and to pay the balance to her; that he carried out her directions explicitly and that she received from Haley the full proceeds of the checks in cash and merchandise purchased as she had directed.

During a considerable part of the time when the Haleys lived with plaintiff and when the checks in dispute were cashed, Haley was unemployed. He then had no income and no means of his own with which to make the purchases of merchandise or the payments of money in question. No reason is suggested in the evidence why he should have made such purchases or payments, if he were able to do so, with his own funds. On the contrary, the only reason suggested for such acts is that the merchandise was purchased with plaintiff's money and that the money turned over to her belonged to her.

Plaintiff was without means of support other than the checks received from her attorneys. She depended on getting the checks promptly, and if the checks did not arrive on the day they were due she promptly called her attorney on the telephone concerning the matter. She did not call him concerning any of the checks in question. She testified that she needed the proceeds of the checks to pay her living expenses and that she never had over $20 in cash on hand. Yet, the evidence shows that during 1938, 1940, and 1941 all the checks covering periods for as long as two months were cashed by Haley and that she managed to get along the same as if she had received them.

Both sides offered expert testimony relative to the genuineness of the signatures. As to the facts concerning Haley's getting possession of the checks, his acting as plaintiff's agent in cashing them and accounting to her for the proceeds thereof, plaintiff's case stands on her unsupported testimony. As to such facts, defendants' version was supported by the testimony of both Mr. and Mrs. Haley, by one of the slips written by plaintiff listing the merchandise to be purchased for her by Haley, by testimony to the effect that plaintiff on one occasion accompanied Haley to Esslinger's place, where she sat in the automobile while he went inside to cash a check and to purchase merchandise, and by the other facts which have been stated above.

Although the actions were for the recovery of money judgments and triable to a jury, the parties stipulated that the only issue to

be submitted to the jury was whether any, and if so which, signatures of plaintiff appearing on the checks were written by Haley. The verdict was that all the signatures of plaintiff on the checks in question were written by him. The court in each case adopted the finding so made and among other things made findings of its own to the effect that plaintiff received from Haley all the proceeds of the checks in the form of cash and merchandise; that all the cash and merchandise were received by plaintiff under such circumstances that she was charged with notice and knowledge that the same were the proceeds of the checks in question; that plaintiff accepted the merchandise and cash under such circumstances that the same were in full satisfaction and payment for the proceeds of all said checks; and that by her silence and conduct plainttiff ratified, affirmed, and accepted the actions of Haley in cashing the checks. Among others, the court found as a conclusion of law that the plaintiff had ratified Haley's actions and conduct in cashing the checks.

■ The first question is whether or not, assuming a ratification in fact, plaintiff is liable for Haley's acts. Where a signature on a check or other negotiable instrument is forged or unauthorized, the rights of the parties to the instrument are determined by N. I. L. § 23 (Minn. St. 1941, § 335.12 [Mason St. 1927, § 7066]), which provides:

"When a signature is forged or made without the authority of the person whose signature it purports to be, it is wholly inoperative, and no right to retain the instrument, or to give a discharge therefor, or to enforce payment thereof against any party thereto, can be acquired through or under such signature, unless the party against whom it is sought to enforce such right is precluded from setting up the forgery or want of authority."

The problem here is whether or not "precluded" includes cases of ratification. The authorities are in conflict, and consequently we must choose what appears to us to be the correct rule. The question is one of statutory construction.

The section in question, like many other provisions of N. I. L., is declaratory of prior law. Montgomery Ward & Co. Inc. v. Central Co-op. Assn. 201 Minn. 425, 276 N. W. 731. "The common law indicates what is meant in the statute by the provision 'unless the party against whom it is sought to enforce such right is precluded from setting up the forgery or want of authority.'" Gluckman v. Darling, 85 N. J. L. 457, 459, 89 A. 1016. As used in this connection, the word "preclude" is a comprehensive one denoting "to prevent or hinder by necessary consequence or implication." See Webster's New International Dictionary (2 ed.) 1937.

A party may be prevented as a consequence of ratification from asserting a right or a defense. In numerous cases decided both before and after the enactment of N. I. L. in 1913, the word "preclude" was used with such meaning. In Woodbury v. Larned, 5 Minn. 271, 276 (339, 344), where a principal by accepting the benefits of a transaction ratified his agent's extension of the time of payment of a promissory note, we held that the legal consequence of the ratification was to preclude the principal from denying the agent's authority to consent to the extension. We said:

"* * * Indeed, it is scarcely possible he could have taken away the interest note with the other, without an inquiry as to the facts of the transaction; and the authorities above cited, with others which might be adduced, show that by accepting a benefit accruing from the acts of the agent, he is *precluded* from denying his authority." (Italics supplied.)

In Washburn v. Van Steenwyk, 32 Minn. 336, 356, 20 N. W. 324, 330, we held that an election made by a guardian on behalf of a widow in another state to take under a will was binding on the widow and "precluded" her from making a different election in this state. In Marshall v. Gilman, 52 Minn. 88, 97, 53 N. W. 811, 812, we held that the bringing of a former action for rescission did not "preclude" plaintiff from recovering damages in a subsequent action for a breach of representations and warranties. In Johnson v. Town of Clontarf, 98 Minn. 281, 286, 108 N. W. 521, 523, we held

that plaintiff was not "precluded" by an application of the doctrine of election between inconsistent remedies from maintaining his action. The cited cases were decided prior to the enactment of N. I. L. We call attention to only a few cases subsequently decided, where we used the word "precluded" with the same meaning. Dickinson v. Citizens I. & F. Co. 139 Minn. 201, 204, 165 N. W. 1056, 1057 (a case of ratification by a corporation of its attorney's acts); Nelson v. Berkner, 139 Minn. 301, 305, 166 N. W. 347, 348 (contract provision held not to *preclude* vendee from showing fraud in its procurement); Edward· Thompson Co. v. Schroeder, 131 Minn. 125, 128, 154 N. W. 792, 793 (to same effect, where there was a sale of lawbooks).

Other courts and writers have used the word "preclude" with the same meaning. Henry v. Heeb, 114 Ind. 275, 16 N. E. 606, 5 A. S. R. 613. The note in 5 A. S. R., at p. 619, quotes Wharton on Agency and Agents as using the word with the same meaning. In Thompson v. Howard, 31 Mich. 309, 312, an election of inconsistent remedies was held to "preclude" the party from making another election. In Lull & Skinner Co. v. Kemmerer Vehicle Co. 136 Iowa 549, 114 N. W. 22, the syllabus says that an accord or satisfaction "precluded" plaintiff from claiming further damages. To the same effect is the decision in Miller v. Layne & Bowler Co. (Tex. Civ. App.) 151 S. W. 341.

Of course the word "precluded" also denotes the consequence of an estoppel. A party may be precluded by estoppel the same as by other acts. But "precluded" is not the equivalent of an estoppel, and its meaning should not be so limited. A formidable array of authorities hold that the word "precluded" in § 23 of the N. I. L. means "estopped." The leading case is Olsgard v. Lemke, 32 N. D. 551, 156 N. W. 102. Other cases to the same effect are Anderson v. Mechanics L. & S. Co. 58 Ga. App. 147, 198 S. E. 87; Baskett v. Ohio Valley B. & T. Co. 214 Ky. 41, 281 S. W. 1022; Home Credit Co. v. Fouch, 155 Md. 384, 142 A. 515; Scott v. First Nat. Bank, 343 Mo. 77, 119 S. W. (2d) 929; Boone v. Citizens B. & T. Co. 154 Tenn. 241, 290 S. W. 39, 50 A. L. R. 1369; Morris Plan Bank v.

Continental Nat. Bank (Tex. Civ. App.) 155 S. W. (2d) 407. Other authorities of high standing hold that a party may be "precluded" under the act by a ratification. Kaufman v. Helmick, 212 Ill. App. 10; Coral Gables, Inc. v. Granara, 285 Mass. 565, 189 N. E. 604. In Olsgard v. Lemke, *supra,* the court failed to consider the meaning attached to the word "precluded" in prior cases cited *supra* in which that question was discussed. The Kentucky and Maryland cases were decided upon the authority of Olsgard v. Lemke. The position of the Tennessee court is not clear. It held that it was not necessary to decide the question in Denison-Gholson Dry Goods Co. v. Hill, 135 Tenn. 60, 185 S. W. 723, but that case is cited as authority for the rule that a "forgery" is incapable of ratification, under § 23 of the N. I. L., in the later case of Boone v. Citizens B. & T. Co. 154 Tenn. 241, 290 S. W. 39, 50 A. L. R. 1369. The Texas and Georgia courts cite Brannan, Negotiable Instruments Law (4 ed.). The Texas court does not refer to the earlier Texas decision of Miller v. Layne & Bowler Co. (Tex. Civ. App.) 151 S. W. 341, *supra,* where the court held that a party may be precluded by a compromise and settlement. The Missouri court cites Olsgard v. Lemke, the foregoing cases which rely on Olsgard v. Lemke and some others, and Brannan, Negotiable Instruments Law without stating which edition.

Cases holding that "precluded" as used in § 23 is equivalent to estoppel and excludes ratification, some of which cite Brannan, Negotiable Instruments Law (4 ed.), have been repudiated in a later edition of that work, where in speaking of cases that announce such a rule the text says: "It is submitted that they should not be followed. The word 'precluded' is broad enough to include ratification; * * *." *Id.* (6 ed.) p. 336.

The history of the statute shows that "precluded" was intended to apply to cases of ratification. N. I. L. is based upon and largely copies the English Bills of Exchange Act. The purpose of the English act, the same as N. I. L., was not to change the prior law, but was, as its title indicates, "to codify" it. See text of Bills of Exchange Act in Brannan, Negotiable Instruments Law (6 ed.)

p. 1229. N. I. L. § 23, is substantially the same as § 24 of the English act, except that the latter has a proviso "that nothing in this section shall affect the ratification of an unauthorized signature not amounting to a forgery." It is clear that under the English act "precluded" was broad enough to include cases of ratification.

The uniform law commissioners' original draft of N. I. L. § 23, contained a similar proviso; but it was dropped, and a footnote was added that a forged signature may be ratified, citing authorities to sustain that proposition. Brannan, Negotiable Instruments Law (6 ed.) p. 18. It is reasonably clear that there was reason for the proviso in the English act, but not in N. I. L., and that dropping the proviso in the latter did not indicate any intention to change the meaning. In 1882, when the English act was adopted, there was no authority in that country expressly holding that an unauthorized signature not amounting to a forgery could be ratified, but that such an unauthorized signature could be ratified seems to have been the generally accepted view. In 1871, Brook v. Hook, L. R. 6 Ex. 89 (cited in Wilson v. Hayes, 40 Minn. 531, 539, 42 N. W. 467, 12 A. S. R. 754, 4 L. R. A. 196), was decided and held that a "forgery" could not be ratified, at least where the purpose was to stifle prosecution of the forger. In cases where an unauthorized signature does not amount to a forgery, the cited case and others were believed to sustain the rule that the signature could be ratified. See Byles on Bills (20 ed.) pp. 298-299; 1 Halsbury's Laws of England (2 ed.) Agency, p. 230, § 398.

It is of course a common legislative practice, born out of abundance of caution, to add a proviso to prevent a possible misinterpretation of the language used, where such a result is feared. See State v. Twin City Tel. Co. 104 Minn. 270, 116 N. W. 835. Obviously, the purpose of the proviso in the English act was to guard against misinterpretation and to make it clear that the word "precluded" under the act the same as under the prior law applied to cases of ratification.

The situation in this country was different. At the time N. I. L. was drafted, the rule was thoroughly settled that an unauthorized signature not amounting to a forgery could be ratified so as to "preclude" a party. The only doubt was whether a forgery could be so ratified. Wilson v. Hayes, 40 Minn. 531, 42 N. W. 467, 12 A. S. R. 754, 4 L. R. A. 196; Henry v. Heeb, 114 Ind. 275, 16 N. E. 606, 5 A. S. R. 613, and note; 8 Am. Jur., Bills and Notes, p. 322, § 608. By dropping the proviso, no intention to change the meaning of § 23 was shown. If the prior law were given effect (that was definitely intended) as having been reënacted by N. I. L., there was no need for a proviso. The process of dropping the proviso as a superfluous adjunct and adding the footnote clearly shows that "precluded" was intended to apply to cases of ratification, for the reason that the footnote explains the scope and extent of ratification by stating that it shall apply to cases of forgery. Otherwise there would have been no occasion to mention ratification in the footnote at all. The footnote simply clarifies the doubt as to whether a forgery could be ratified and shows that in the opinion of the commissioners it could be. The explanation only serves to make it clear that "precluded" included cases of ratification. After all, a forged signature is an unauthorized one. It is preposterous to think that it was intended to permit a forged, but not an unauthorized, signature to be ratified and thus "preclude" a party. It seems that the framers of N. I. L. intended that under that act the same as under the prior law a party may be "precluded" by a ratification.

We think that the cases holding that the word "precluded" as used in § 23 is equivalent to estoppel are unsound, because: (1) they are opposed to the evident intention of the framers of N. I. L.; (2) they are opposed to the prior law, which N. I. L. adopted, under which the word "precluded" included cases of ratification and particularly to our decisions to that effect; and (3) that a construction that the word "precluded" means "estopped" would defeat the apparent legislative intent by attaching to the word an unwarranted restriction on its meaning and scope.

On the contrary, we think that to construe the word "precluded" as including cases of ratification would accord with the intent of the lawmakers. After all, ratification is based upon universally accepted principles of justice. There is no more reason for precluding a party by estoppel than by ratification or election.

We adopt the view that "precluded" includes "ratification" and so construe our statute. A party may be precluded by a ratification under N. I. L. § 23 (Minn. St. 1941, § 335.12 [Mason St. 1927, § 7066]).

There is no finding that plaintiff authorized Haley to sign her name to any check. No particular form of authorization is necessary. "* * * the authority of the agent may be established as in other cases of agency." N. I. L. § 19 (Minn. St. 1941, § 335.115 [Mason St. 1927, § 7062]). Plaintiff's ratification of Haley's acts is a substitute for precedent authority. Ratification by a party of another's unauthorized acts occurs where the party with full knowledge of all material facts confirms, approves, or sanctions the other's acts. Farmers Co-op. Exch. Co. v. Fidelity & Deposit Co. 149 Minn. 171, 182 N. W. 1008. Ratification is equivalent to prior authority. Although an act may be done without precedent authority, ratification creates the relation of principal and agent, and the former becomes bound by the act to the same extent as if it had been done under a previous authorization. Hunter v. Cobe, 84 Minn. 187, 87 N. W. 612; Janney v. Boyd, 30 Minn. 319, 15 N. W. 308.

By ratification, the principal absolves the agent from any liability to the principal which otherwise would result from the fact that the agent acted without authority. Triggs v. Jones, 46 Minn. 277, 48 N. W. 1113; Sheffield v. Ladue, 16 Minn. 346 (388), 10 Am. R. 145; 1 Dunnell, Dig. § 191. Cf. Goss v. Stevens, 32 Minn. 472, 21 N. W. 549.

There is a conflict in the authorities as to whether or not a forgery may be ratified. By a forgery is meant an unauthorized signature on an instrument or a material alteration thereof in violation of a criminal statute. Where the unauthorized signing of another's name to an instrument does not constitute the crime

of forgery, all the authorities agree that the party whose name was so signed may ratify the signature and become bound thereby. Wilson v. Hayes, 40 Minn. 531, 42 N. W. 467, 12 A. S. R. 754, 4 L. R. A. 196; Henry v. Heeb, 114 Ind. 275, 16 N. E. 606, 5 A. S. R. 613, and note.

The unauthorized signatures in the instant case did not constitute the crime of forgery. Under our statutes, Minn. St. 1941, §§ 620.06 and 620.20 (Mason St. 1927, §§ 10321 and 10335), an intent to defraud is an essential element of forgery. The gist of the offense of forgery is the intent to defraud. State v. Greenwood, 76 Minn. 211, 78 N. W. 1042, 77 A. S. R. 632. Where there is no intent to defraud, signing another's name without authority does not constitute the crime of forgery. State v. Bjornaas, 88 Minn. 301, 92 N. W. 980, 982. In the cited case defendant's wife through him as her agent had sold some grain to one Aune, who gave a check therefor payable to one Bartelson, a creditor of her husband, and delivered the check to the husband, who, in order to obtain the money due his wife, endorsed Bartelson's name thereon as payee without being authorized by him to do so. We held that the husband was not guilty of forgery if "he honestly believed that he had the right to indorse the name of Bartelson thereon, to secure for his wife what belonged to her." Cf. Regina v. Beardsall, 1 F. & F. 529. Here, there is no finding that Haley intended to defraud plaintiff. The evidence is conclusive that he had no such intent. Over a period of about five years he cashed 69 of her checks. In each instance, if he intended thereby to benefit personally or to benefit a third party he had ample opportunity to do so by a misappropriation of the proceeds of the checks. In each instance he acted as her agent to purchase merchandise and to account to her for the proceeds of the checks in cash and merchandise. He made no misappropriation; he discharged his duties as such agent by making the purchases and by making a full accounting. Under such circumstances, the only inference is that he not only had no intent to defraud, but that his intention was to serve plaintiff as she had directed.

An unauthorized signature on a note, check, or other instrument under circumstances not constituting the crime of forgery may be ratified. Theelke v. Northern States Power Co. 192 Minn. 330, 256 N. W. 236; Wilson v. Hayes, 40 Minn. 531, 42 N. W. 467, 12 A. S. R. 754, 4 L. R. A. 196, and Henry v. Heeb, 114 Ind. 275, 16 N. E. 606, 5 A. S. R. 613, and note, *supra;* Casco Bank v. Keene, 53 Me. 103; Coral Gables, Inc. v. Granara, 285 Mass. 565, 189 N. E. 604, *supra;* Commercial Bank of Buffalo v. Warren, 15 N. Y. 577; Rosenthal v. Hasberg, 84 N. Y. S. 290; Wells, Fargo & Co. v. Simpson Nat. Bank, 19 Tex. Civ. App. 636, 47 S. W. 1024; McDermott v. Jackson, 97 Wis. 64, 72 N. W. 375.

■ Where a principal accepts and retains the benefits of an unauthorized act of an agent with full knowledge of all the facts, he thereby ratifies the act. Johnson v. Ogren, 102 Minn. 8, 112 N. W. 894; 1 Dunnell, Dig. § 184. The rule applies to unauthorized signatures. A party who with full knowledge of the facts receives and retains the proceeds or the benefits of his unauthorized signature upon an instrument ratifies the signature. Campbell v. Campbell, 133 Cal. 33, 65 P. 134; Union Bank v. Middlebrook, 33 Conn. 95; Livings v. Wiler, 32 Ill. 387; McDermott v. Jackson, 97 Wis. 64, 72 N. W. 375, *supra.*

Here the evidence sustains the finding that plaintiff received the proceeds of the checks in cash and merchandise with full knowledge of all the facts. The finding is supported by Haley's testimony that he cashed the checks and delivered the cash and merchandise to her pursuant to her directions. The proceeds of the checks were as definitely identified and traced as were those to establish a constructive trust in Third Nat. Bank v. Stillwater Gas Co. 36 Minn. 75, 30 N. W. 440. Haley's wife corroborated him. The circumstances support his version. At the time Haley had no means or income with which to purchase the merchandise or to make the payments. Plaintiff's checks were the only possible source of the money Haley used for such purposes. The purchases and the payments occurred at about the time that plaintiff received the checks in question. The fact that she did not complain to her attorneys

that she had not received any check in question, as was her custom when she did not receive the checks, tends to show that her claim that she did not receive them is untrue and that she not only received them, but that she delivered them to Haley. If so, it confirms his version of the facts. Standing alone, her going with Haley to Esslinger's .and sitting in the car while he went inside and cashed a check and made purchases carries a strong suggestion that she had actual knowledge of what he was doing on that occasion. In the case of the checks passed on McBryan, which are the first two checks involved, her attention was definitely directed to the .fact that her name had been signed to the checks. Furthermore, no reason appears why Haley should have paid any money or delivered any merchandise to her unless the merchandise and the money belonged to her.

Our conclusion is that plaintiff ratified all the unauthorized signatures in these cases; that by reason of such ratification she is *precluded* from setting up the fact that her signatures were unauthorized in the actions against Haley and the other defendants and in her defense to Lux's counterclaim.

Affirmed.

