THE BANK OF NOVA SCOTIA, Plaintiff and Appellant, *v.* GREGORIO VÉLEZ RULLÁN, Defendant and Appellee.

No. CE-64-12.        Decided November 17, 1964.

348

*Brown, Newsom, Córdova & Díaz* for appellant. *Jorge Marín Báez* for appellee.

Division composed of Mr. Chief Justice Negrón Fernández, Mr. Justice Blanco Lugo, and Mr. Justice Ramírez Bages.

MR. JUSTICE RAMÍREZ BAGES delivered the opinion of the Court.

The Bank of Nova Scotia, appellant herein, sued Gregorio Vélez Rullán in an action of debt for the amount of $1,970 plus interest for two bank drafts issued by Ramón L. Soldevila Ferrer against appellee on July and August 1957, alleging that appellant is the holder thereof, that they were accepted by appellee and the latter refused to pay them. The name of Gregorio Vélez Rullán appears on the back of both drafts; below is the signature of Francisco Laguna, and then a stamp which says: "Pay to the order of The Bank of Nova Scotia for Value Received"; and underneath, the signature of Soldevila Ferrer. Upon presentation for payment appellee refused to pay its value and wrote on the back of one of the drafts "I owe nothing to this gentleman," and signed his name underneath the note. Appellee denied the facts alleged in the complaint except that he was required to pay said instruments and he had not paid them to appellant "because he owes nothing to plaintiff." The District Court, Utuado Part, dismissed the complaint and to that effect determined that appellee had not personally signed the drafts accepting them, and that Laguna never received agency, authority, or order to sign for appellee, the relations between the contracting parties being those arising from a contract for the transportation of flour; that Laguna was induced to sign and write appellee's name in the aforementioned drafts as a prerequisite to

the delivery of the flour in the belief that he was signing a "delivery check" in order to be able to transport the flour, and never a note, because he had neither express nor implied agency nor by deed; that defendant owes nothing to the Bank or to Soldevila for the sale of flour; and lastly, that the absolute nullity thereof appears from the face of the drafts, for which reason plaintiff is not a holder in good faith, citing, in support of the last conclusion, §§ 354, 368, 371, 416, 418, 479 and 480 of the Code of Commerce in force. On appeal, the Superior Court, Arecibo Part, affirmed the judgment on the ground that the conclusions reached by the trial court were amply supported by the evidence under its consideration.

In its petition for certiorari appellant points out that the Superior Court erred in affirming the judgment of the District Court in which the latter erred in failing to apply the provisions of §§ 1601 of the Civil Code and 376 of the Code of Commerce to this case, and in failing to reverse said judgment and order a new trial, because the testimony of one of the principal witnesses could not be transcribed; and, lastly, in ordering appellant to pay attorney's fees, and, in case they were proper, in awarding such amount.

To support its contention the Bank alleges that it is holder in good faith of the drafts in question, since it complies with the requirements of § 405 of the Code of Commerce (19 L.P.R.A. § 92).[1] Although it admits that the capacity of holder would be of no effect if the instruments

---

[1] Section 405 of the Code of Commerce provides:

"A holder in due course is. a holder who has taken the instrument under the following conditions:

1. That it is complete and regular upon its face;

2. That he became the holder of it before it was overdue, and without notice that it had been previously dishonored, if such was the fact;

3. That he took it in good faith and for value;

4. That at the time it was negotiated to him he had no notice of any infirmity in the instrument or defect in the title of the person negotiating it."

in question were actually signed by Laguna without authority, it maintains that from the relations and deeds of the parties, it should be reasonably concluded and inferred that the implied agency contemplated by § 1601 of the Civil Code in force (31 L.P.R.A. § 4422) existed in this case. Furthermore, assuming that Laguna had exceeded the scope of the authority conferred upon him by appellee, the latter is bound to honor said two drafts since it is precluded from setting up the want of authority and because by receiving and using the flour he impliedly ratified the acts of his agent, Laguna.

On the contrary, appellee alleges that the drafts are "null and void" because they were not signed by appellee and, therefore, are not subject to implied or express acceptance; that even if the instrument were valid "still defendant (appellee herein) would not be liable, but rather those who endorse the promissory note," as provided by §§ 371, 373, and 376 of the Code of Commerce (19 L.P.R.A. §§ 19, 21, and 24); that appellant is not a holder in good faith since the nullity of the notes appears from their face.

First we must decide whether the notes in question were valid, and, therefore, whether or not appellant, as holder thereof, was a holder in due course, and then, we must determine, in the event it was, whether or not the defense of want of authority was proper.

■ Every holder is deemed prima facie to be a holder in due course; but when it is shown that the title of any person who has negotiated the instrument is defective, the burden is on the holder to prove that he or some person under whom he claims acquired the title as holder in due course. Section 412 of the Code of Commerce (19 L.P.R.A. § 99).

■ ■ Although it is true that the acceptance is not signed by the drawee himself as provided by § 485 of the

Code of Commerce (19 L.P.R.A. § 241),[2] it could be signed by a duly authorized agent and said authority of the agent may be established as in other cases of agency, pursuant to § 372 of the Code of Commerce (19 L.P.R.A. § 20).[3] It is not essential to the regularity of the acceptance in this case that the authority of Laguna to sign said drafts should appear from the face thereof. *Wegener* v. *Emmetsburg Nat. Bank,* 193 N.W. 627, 631 (Iowa 1923); *Pennover* v. *Dubois State Bank,* 249 Pac. 795 (Wy. 1926). The authority in question could be found to exist from the course of dealings although there were no specific instructions. Beutel's, Brannan Negotiable Instruments Law 410 (7th ed.). The presumption that the notes were genuine includes the presumption that the agent was entitled to the endorsement (in this case to the acceptance). *Dean* v. *Felton,* 266 Pac. 236 (Ore. 1928).

■■ In case they were signed by an agent without the authority they are wholly inoperative and by virtue of said signature no right can be acquired to enforce payment thereof unless the drawee, appellee herein, were precluded from setting up in his defense the want of such authority. Section 376 of the Code of Commerce (19 L.P.R.A. § 24).[4]

---

[2] Section 485 of the Code of Commerce reads:

"The acceptance of a bill is the signification by the drawee of his assent to the order of the drawer. The acceptance must be in writing and signed by the drawee. It must not express that the drawee will perform his promise by any other means than the payment of money."

[3] Section 372 of the Code of Commerce provides that:

"The signature of any party may be made by a duly authorized agent. No particular form of appointment is necessary for this purpose; and the authority of the agent may be established as in other cases of agency."

[4] Section 376 of the Code of Commerce reads:

"When a signature is forged or made without the authority of the person whose signature it purports to be, it is wholly inoperative, and no right to retain the instrument, or to give a discharge therefor, or to enforce payment thereof against any party thereto can be acquired through or under such signature, unless the party, against whom it is sought to enforce such right, is precluded from setting up the forgery or want of authority."

The term "precluded" as used in § 376 of the Code of Commerce includes not only the "estoppel" but also the ratification in cases of acts in excess of, or without authority. *Chemical Corn Exchange Bank & Trust Co.* v. *Frankel*, 111 So.2d 99 (Fla. 1959); *Johnson* v. *Crown Finance Corp.*, 222 S.W.2d 525 (Mo. 1949); *Strader* v. *Haley*, 12 N.W.2d 608 (Minn. 1943); 150 A.L.R. 970; Britton, Bills & Notes 343, § 128 (2d ed.); Beutel's, Brannan Negotiable Instruments Law, *supra*.

Section 1601 of the Civil Code (31 L.P.R.A. § 4422), provides that the agency may be express or implied, that no particular form is necessary, that it may be given even by parol and that the implied acceptance may be inferred from the acts of the agent. Section 1618 of said Code (31 L.P.R.A. § 4461) provides that the principal is liable insofar as the agent has exceeded his power, only when he ratifies the same, expressly or in an implied manner. Section 548 of the Code of Commerce (19 L.P.R.A. § 386), provides that in cases not provided for in the Code, relative to negotiable instruments the rules of the Mercantile Law, Civil Law, and Equity shall govern.

■ The existence of authority may be inferred from the acts of the principal, from acts or deeds which manifestly reveal such declaration of consent necessarily implying, evidently and clearly, the intent to be bound. If an agency is created subsequent to a particular situation of facts, it might well be understood that in case the principal creates a similar situation in the future he means to create a new agency. When a person has been clothed with apparent authority and held out to the public by the principal as his agent, that is sufficient to prove the existence of the agency. When authority is granted to perform certain acts, implied authority may exist to perform particular acts necessary to carry them out, or which are included within the acts commissioned. *Torres* v. *Porto Rico Racing Corpora-*

*tion et al.,* 40 P.R.R. 423 (1930); *Pereles* v. *Ongay Garage & Radio Co.,* 60 P.R.R. 7, 11 (1942); *National City Bank* v. *Del Moral,* 46 P.R.R. 627 (1934); *Vivaldi & Arbona* v. *Registrar,* 36 P.R.R. 496 (1927); *Bello et al.* v. *Registrar of Arecibo,* 31 P.R.R. 112 (1922); *Reyes* v. *Palerm,* 29 P.R.R. 707 (1921); Judgment of the Supreme Court of Spain of May 21, 1924; Scaevola, XXVI-I *Código Civil* 655–656.

■ The ratification of an agency may be implied as in the case where a purported principal retains and avails himself of the benefits of the transaction consummated without authority or in excess thereof. But in the present case it is indispensable to show that said retention or exploitation was consummated with full knowledge of the alleged agent's acts and of the conditions of the transaction. *Lókpez* v. *Lókpez,* 64 P.R.R. 652, 658 (1945); *Loíza Sugar Co.* v. *Zequeira,* 63 P.R.R. 829, 834 (1944); *Dooley* v. *Pantoja,* 61 P.R.R. 619 (1943); *Gutiérrez* v. *Bustelo,* 15 P.R.R. 228, 230 (1909); *Goenaga* v. *Goenaga,* 15 P.R.R. 532, 541 (1909); Judgments of the Supreme Court of Spain of April 5, 1950,[5] June 25, 1946,[6] March 3, 1942,[7] April 6, 1934,[8] June 17, 1920,[9] March 13, 1913,[10] and July 8, 1903.[11] XXVI-II Scaevola, *Código Civil* 500–501. In *Newco Land Co.* v. *Martin,* 213 S.W.2d 504 (Mo. 1948), it was stated that: "The mere fact that the principal has received or enjoyed the benefits of an unauthorized act will not amount to a ratification if he did so in ignorance of the facts; nor will his retention of benefits after knowledge of facts amount to a rati-

---

[5] III-30 *Jur. Civ.* 625.

[6] III-15 *Jur. Civ.* 363.

[7] Aranzadi, IX *Repertorio de Jurisprudencia* 178, Judgment No. 315.

[8] III-213 *Jur. Civ.* 406.

[9] 150 *Jur. Civ.* 623–633.

[10] 126 *Jur. Civ.* 622.

[11] 96 *Jur. Civ.* 123.

fication if at the time he acquires such knowledge, and without his fault, conditions are such that he cannot be placed in status quo or repudiate the entire transaction without loss." See, also, *J. R. Watkins Company* v. *Vangew,* 116 N.W.2d 641 (N.D. 1962); *Karetzkis* v. *Cosmopolitan National Bank,* 186 N.E.2d 72 (Ill. 1962); *Taylor* v. *Connell,* 345 S.W.2d 4 (Ark. 1961); *Yarnall* v. *Yorkshire Worsted Mills,* 87 A.2d 192 (Pa. 1952).

■ In order that the bar referred to in § 376 of the Code of Commerce may exist by way of estoppel in a case like this, it is necessary to show that the conduct of the appellee induced the appellant to change his position and to act to his prejudice in consequence of said acts. *Pereles, supra.*

■ In *Quevedo* v. *Estate of Pino,* 15 P.R.R. 669 (1909), in which it was sought to prove the existence of an agency, we laid down the doctrine to the effect that when the evidence upon the existence of an agency is contradictory "it devolves on the court, sitting without a jury, to decide on the credibility of the witnesses and to answer the question of fact according to a preponderance of the evidence." In such circumstances "we will be very reluctant to disregard the findings of the trial court . . . ."

■ It is evident from the foregoing that the drafts in question were valid when appellant discounted them, and that the latter was, *prima facie,* a holder thereof in good faith, subject to the defense of Laguna's want of authority to accept them on behalf of appellee. The question, therefore, is limited to determining from the evidence whether or not Laguna was authorized to accept the drafts on behalf of appellee, and if he was not, either expressly or impliedly, whether or not appellee was precluded from pleading the defense of such want of authority.

The evidence shows that (1) appellant received both drafts from the hands of the drawer with acceptance thereon

signed by Laguna on behalf of appellee; (2) it discounted them prior to the date of maturity; (3) upon its face no defect appeared; (4) it sent them to an agent in Utuado for collection, (5) they were presented to appellee for collection; and (6) he did not pay them because "he owed nothing to Soldevila Ferrer (the drawer)."

Witness Alvarado, former employee in charge of the office of the drawer (Soldevila) of the drafts and who on the date on which the notes were drawn "was only in charge of the sale of flour," testified that appellee used to buy flour from Soldevila Ferrer on credit through the witness; that to that effect appellee had opened a current account in Soldevila's office; that when flour was sold to appellee, "although they had a current account and the flour was charged to credit, then, Vélez Rullán (appellee) signed drafts for the purpose of raising funds in the Bank, since the note from the mill where the flour was bought had to be paid before the flour was sent to Vélez Rullán"; that delivery of goods was made to Gregorio Vélez Rullán without any prerequisite because Vélez Rullán enjoyed good credit and was absolutely trustworthy in the office, and that "only when the office did not have any available flour already paid for in the Bank, or had no funds to pay Vélez Rullán's drafts to raise the funds, it was not necessary for Vélez to sign drafts to acquire the flour, because if they had any flour available Vélez did not need to sign any draft because he had a current account; that when Vélez Rullán was unable to go to San Juan every day he had drafts signed in blank in the office"; that he knew Laguna's signature "because several times he took his signature in the delivery check of the merchandise." He testified that "it is possible that Laguna signed the drafts because the same situation may have arisen with other drafts and Laguna signed them . . . that generally the carters signed drafts, and that in certain occasions, like the present,

in order not to fail rendering service to the client, it is assumed they took the signature on the draft." Upon being questioned whether it was the practice of the business to obtain signatures of persons without authority therefor, and with said unauthorized signatures go to the bank and obtain money, Alvarado answered that "in this specific case . . . Laguna's signature was taken in the office because it was known that he was considered an absolutely reliable person by Vélez Rullán. That it is true that Vélez Rullán never complained of the signatures." He added: "as far as I remember, Vélez did not pay drafts without [sic] in the Bank, because the drafts were paid by the office on the date of maturity with a check of the office"; that "he (referring to appellee) gave me checks to credit to his current account, then the office paid said drafts to the Bank not with the money he gave, but it was credited to his account and then remittances were made to the Bank and then the office made out a check and paid said drafts." Later on it testified: "Here comes a very important explanation: They were not always signed in the office; for delivery of flour the notes made in the office to be discounted were not always for flour delivery, because when there was surplus of flour which had already been paid for by the agent, the office delivered the flour to the client without a draft, and it was charged to his current account; then, if said client's draft matured and there was no money in the office to pay for it, then a draft was issued against said client, it was discounted in the bank and the draft which had matured was paid, so that the drafts issued were not always for flour delivery." That "Vélez Rullán signed the drafts to raise funds in the bank and not specifically to have the flour delivered."

Lastly, he testified: "I understand that according to a detailed current account which was sent to Vélez Rullán, I understand there is a balance against Vélez Rullán and in favor of Soldevila, but that at the present time they are

not sure as to the exact amount, which is possibly over $1,000."

Appellee Vélez Rullán testified that he made all his business dealings with Soldevila Ferrer's firm through his agent Alvarado; that said business consisted in the purchase of flour; that he purchased the flour by invoices, they sent the invoice and he sent a check; that on some occasions he signed drafts, for the purpose of raising funds; his relation with Laguna consisted in that the latter charged the flour to him; that Laguna went personally for the flour, but that he does not know who delivered it to him; that the two drafts were presented to him for payment, he does not recall the date, but on that date he had already liquidated Soldevila's account through Alvarado. That the reason he had for not paying the drafts was that he owed nothing to Soldevila Ferrer; that he had not paid to the Bank, but he had paid to Soldevila Ferrer through Alvarado.

Francisco Laguna testified that he fetched merchandise for appellee on different occasions; that he signed certain instruments (drafts) in this case; that Alvarado told him that they were "delivery checks". That upon appellee's orders he went to fetch flour, he brought it to the latter's bakery and delivered it to him; that he had appellee's instructions to bring the merchandise "but he signed as 'delivery check,' as Alvarado told him." That that was the only time Alvarado told him to sign like that, otherwise he gave orders for the pier. That at the pier, for example, if he was going to pick up the merchandise he signed the name of Francisco Laguna, the clerk wrote the name of Vélez Rullán. That on two occasions, when he went to pick up flour for appellee, Alvarado told him: "Sign here so you can take the flour." He refers to the two occasions when he signed the drafts in question.

There is no doubt that the statement of the case made by the trial judge is incomplete. It not only fails to include

a recital of the testimony of the drawer of the drafts in question, Soldevila Ferrer, "because it could not be transcribed, but it will be sent to court with other tapes and records of the case," but also that said testimony does not appear in the magnetophonic tapes attached to the record. Said statement does not reveal the circumstances which gave rise to the admission of appellant's Exhibit F, which consisted of a draft drawn by Soldevila against appellee, in December 1952, endorsed with appellee's name in ink (but not Laguna's name) in a handwriting similar to Laguna's, who signed Exhibit G, and underneath said signature the endorsement to the order of appellant, by Soldevila and appellant's stamp to the effect that the note had been presented for payment.

■ The hearing of this case at the District Court, Utuado Part, ended on June 12, 1959. Judgment was rendered on January 15, 1960. An appeal was taken on the 26th of the same month and it was not until March 31, 1963 that the statement of the case was terminated. By November 8, 1959 Soldevila Ferrer had passed away. Undoubtedly, this unusual delay in preparing the statement of the case gave rise to the aforementioned omissions therein. In order to supply them appellant should have offered a version of Soldevila's testimony and other pertinent explanations and managed its approval by the trial court. In this manner we dispose of the assignment of error based on the absence of a witness' testimony in the record of the case.

From the summary of the evidence we have made it is evident that:

(1) Appellee bought flour from Soldevila through Alvarado and usually the amount of each order was charged to his current account and appellee paid the amount for each purchase by check upon receipt of invoice.

(2) For these purposes appellee contracted the services of Laguna to pick up said product and transport it from

the warehouse or pier in San Juan to appellee's bakery in Utuado.

(3) As a general rule, in order to receive the flour, Laguna had to sign a "delivery check" or receipt according to the practice in this type of business, so as to establish that he had authority, at least implied, for that purpose.

(4) Appellee accepted drafts from Soldevila after the flour was received, and at times, in order to receive it, but in all of these cases of drafts he paid the flour invoices at Soldevila's office, and then the latter paid the drafts at the Bank.

(5) It is possible that Laguna signed drafts on other occasions and that in the two drafts in question Laguna's signature was taken because "it was well known that he was absolutely trusted by Vélez Rullán."

(6) No evidence was offered as to the fact that, prior to or at the time of delivering the flour corresponding to the two drafts which Laguna accepted on behalf of appellee, the latter had any knowledge of said acceptance.

(7) There was evidence that appellee paid Soldevila, through Alvarado, the invoices covered by the drafts in question.

(8) The third draft presented in evidence dates from five years prior to the two drafts, on which the cause of action is based in this case, and it was not definitively proved whether appellee's name signed on the back of the instrument was written by him or by Laguna, and whether appellant received the amount thereof from appellee, or from Soldevila's office, according to the practice established by said office.

In the light of this evidence, we cannot conclude that the trial court erred in holding that Laguna lacked implied authority to sign the drafts in question, or in failing to decide that appellee was precluded from impeaching Laguna's authority to accept the drafts on his behalf, since when appellee accepted and retained the flour in question, he had

no knowledge of the acceptance of said drafts nor performed any act to induce appellant to discount the drafts and to change his position.

In view of the foregoing, the judgment of the Superior Court, Arecibo Part, which, in turn, affirms that of the District Court, Utuado Part, will be affirmed and the attorney's fees will be reduced to the amount of $250.