THERMO CONTRACTING CORP., A NEW JERSEY CORPORATION, PLAINTIFF-APPELLANT, v. THE BANK OF NEW JERSEY, A BANKING CORPORATION OF NEW JERSEY, *ET AL.*, DEFENDANTS-RESPONDENTS, AND SEABROOK FARMS CO., INC., A NEW JERSEY CORPORATION, DEFENDANT-RESPONDENT.

Argued September 22, 1975—Decided March 12, 1976.

*Mr. Robert A. Baron* argued the cause for appellant.

*Mr. Samuel Kalikman* argued the cause for respondents the Bank of New Jersey, et al.

*Mr. Mitchell S. Camp* argued the cause for respondent Seabrook Farms, Inc. (*Messrs. Gladstone, Hart, Mandis, Rathe & Shedd,* attorneys).

The opinion of the court was delivered by

CONFORD, P. J. A. D., Temporarily Assigned. This appeal turns on the question whether plaintiff ("Thermo") ratified unauthorized indorsements by a subcontractor of checks payable to Thermo for contracting work it did so as to preclude actions by it against the collecting and drawee banks and against the drawer of the checks. The Law Division decided the issue against plaintiff and granted summary judgment against it based on that determination, at the same time dismissing various counterclaims and crossclaims by or between Thermo, the two banks involved, the drawer of the checks and the subcontractor. The Appellate Division affirmed on the trial court's opinion. We granted certification. 68 *N. J.* 142 (1975).

The record discloses the following essentially undisputed facts on the motions for summary judgment.

Thermo, whose president and principal stockholder was Alexander Kueller, was a general contractor doing mainly federal government work. Peter T. Kashulines was a subcontractor who had jobs under Thermo more or less continuously from about January 1970 to May 30, 1972. Most of the work was procured by Thermo. The work for Seabrook Farms Co., Inc. ("Seabrook"), the drawer of the checks here involved, was procured by Kashulines, who had done other work for Seabrook before.

The general pattern of the relationship between Kueller and Kashulines was that Kashulines would estimate his price for the total job including labor and material, then send his plans and specifications with the prices noted to Kueller. Kueller would then submit a bid reflecting Kashulines' expenses and profit and his own expenses for office work, obtaining the performance and payment bond and the bid bond, and his own profit. Thereafter the responsibility for furnishing labor, purchasing materials on the job site and supervising the work was delegated in its entirety to Kashulines. The materials purchased at the job site were normally ordered by Kashulines and charged to Thermo through charge accounts opened in the corporate name by Kashulines. There appears to be no dispute as to the scope of Kashulines' authority to purchase, to open charge accounts and to charge in the corporate name.

Although Kashulines' authority to bill and receive payment in the name of the corporation is in dispute, Kueller acknowledges that on at least one job, in Bermuda for the Navy, Kashulines was specifically authorized to do so and in fact picked up a check payable to Thermo and hand-delivered it to Kueller. Kashulines' testimony is that there were other instances where he billed and picked up money but that the normal procedure was to deliver the checks to Kueller and that he was not authorized to indorse and deposit checks on behalf of the corporation.

In the case of the Seabrook jobs it is undisputed, as noted above, that Kashulines individually negotiated the contract with Seabrook. The Seabrook contract apparently involved two separate jobs: The first was the demolition of greenhouses, and the second, the replacement of some boiler tubes. According to Kueller his first knowledge of that job was when the job order dated March 31, 1971 from Seabrook for the boiler tubes was sent to Thermo. Thermo's association with the Seabrook job was limited to ordering the boiler tubes and furnishing the insurance. Kueller testified that he had nothing to do with setting the price, either for labor or materials, and did not know when the job was begun or completed. Kueller testified that the Seabrook job was Kashulines' work "[b]ut run through my books for his convenience." He also indicated, however, that in return for this service he expected to be paid a commission of approximately 25%.

When Kueller was pressed for payment on the boiler tubes, he called Seabrook in November 1971 to find out when Thermo would be paid and was told that the job was finished and that Thermo had already been paid.

Five checks were drawn by Seabrook to the payee, Thermo Contracting Co. The first of these was mailed to Thermo and deposited by Thermo to its own account, and the entire proceeds were paid to Kashulines in a separate check from Thermo to Kashulines. There is no controversy as to this check. The other four checks, dated between March 25, 1971 and June 22, 1971, and aggregating about $13,300, were picked up personally or by employees of Kashulines from the Seabrook office and deposited either by Kashulines himself or by his wife in a checking account at the defendant The Bank of New Jersey in the name of American Boiler Co., a Kashulines firm.

All the check indorsements bore the name Thermo Contracting Corp. or the equivalent, with Kashulines signing either as a purported officer or without designation. There is no question but that Kashulines had no authority from

Thermo to indorse the checks or collect the proceeds thereof, although Kueller testified on depositions that about 75% of the amount of these checks would have been owing to Kashulines under a "pooling" arrangement with Thermo. The checks cleared the depository, defendant The Bank of New Jersey, and the drawee bank, defendant First National State Bank of New Jersey.

Kueller's testimony as to his actions upon learning of the issuance and negotiation of the four checks is as follows:

Q. So that in November 1971 you learned, presumably for the first time, that * * * the four checks which are the subject matter of our presence here today, payable to Thermo, drawn by Seabrook, were paid or issued?
A. Yes, were issued.
Q. I see. You learned that for the first time in November 1971?
A. Uh huh.
Q. I see. What did you do?
A. I immediately took it up with Kashulines.
Q. And.
A. And we talked.

&ast; &ast; &ast; &ast; &ast; &ast; &ast; &ast;

Q. And what was the extent of your discussion with Kashulines concerning the matter?
A. He told me that he was pressed for cash, he had to use the money. He apologized and told me he would make it up to me as soon as he possibly could.
Q. Was that acceptable to you?
A. At the time it was.

&ast; &ast; &ast; &ast; &ast; &ast; &ast; &ast;

Q. * * * you accepted his explanation as to his being sorry and he'll make it up to you.
A. Yes, I did. * * *. I had faith in the man.

Some time after May 1972 Thermo made claims against the various defendants herein and instituted this action September 13, 1972.

Although, as noted, Thermo knew by November 1971 that Kashulines had misappropriated the checks, it made no demand against either of the banks or against Seabrook for payment on them, but continued to do business with Kashulines as usual through May 1972 when Kashulines stopped

working on a Thermo job with the federal government. In that period Thermo not only paid Kashulines from $60,000 to $70,000 for subcontracting work but did not "backcharge" Kashulines for the Seabrook checks because, as Kueller testified, Kashulines "would stop working and then the jobs go into default * * *." In other words, the continuing business relationship with Kashulines was of sufficient value and importance to Thermo to cause it to forego the claim against him on the Seabrook account while that satisfactory relationship continued.

For purposes of this opinion it may be assumed that the collecting and paying banks were *prima facie* liable to Thermo because they paid on the unauthorized indorsements. *Salsman v. National Community Bank of Rutherford,* 102 *N. J. Super.* 482, 489 (Law Div. 1968), aff'd o. b. 105 *N. J. Super.* 164 (App. Div. 1969). Were it not for the effect of our determination as to ratification of the indorsements and actions of Kashulines, the question of defendant Seabrook Farms' liability to Thermo might remain a viable issue on disputed facts in relation to legal issues we need not discuss. We summarily dismiss as meritless Thermo's contention that even on the assumption of ratification Seabrook would remain liable to it for negligence in turning the checks over to Kashulines. Ratification would render the question of negligence academic. Nor is there any substance in Thermo's claim that Seabrook took an improper discount on its obligation in making payment. No effort to sustain this contention by reference to the record is set forth in Thermo's briefs. We conclude that an affirmative resolution of the issue of ratification would be dispositive of the entire case.

▮▮ The controlling statute on this appeal is Section *N. J. S. A.* 12A:3–404 of the Uniform Commercial Code which reads:

(1) Any unauthorized signature is wholly inoperative as that of the person whose name is signed unless he ratifies it or is precluded from denying it; but it operates as the signature of the

unauthorized signer in favor of any person who in good faith pays the instrument or takes it for value.

(2) Any unauthorized signature may be ratified for all purposes of this Chapter. Such ratification does not of itself affect any rights of the person ratifying against the actual signer.[1]

The quoted section, which became law in this State pursuant to *L.* 1961, *c.* 120, § 3–404, superseded *R. S.* 7:2–23,[2] a part of the former Uniform Negotiable Instruments Law. While the former statute spoke in terms of preclusion only, not mentioning ratification, the concept of preclusion was conceived as comprehending ratification. See Brannan, *Negotiable Instruments Law* 18 (6th ed. 1938); *Russell v. Second National Bank of Paterson,* 136 *N. J. L.* 270, 277–278 (E. & A. 1947); New Jersey Study Comment to *N. J. S. A.* 12A:3–404, at 210. The case before us does not require exploration of the implications of preclusion[3] aside from the reach of the concept of ratification, but it may be noted that the distinctions between ratification and preclusion in the sense of estoppel have at times been blurred. See Hart & Willier, Commercial Paper, 2 *U. C. C. Rep. Serv.* (1972), § 12.13[3], p. 12–52.

The meaning of ratification for purposes of negotiable instruments law is not dissimilar from its general

---

[1]For purposes of the Code, even a forgery may be ratified. *N. J. S. A.* 12A:3–404(1); *N. J. S. A.* 12A:1–201(43).

[2]That section read:

Where a signature is forged or made without the authority of the person whose signature it purports to be, it is wholly inoperative, and no right to retain the instrument, or to give a discharge therefor, or to enforce payment thereof against any party thereto, can be acquired through or under such signature, unless the party, against whom it is sought to enforce such right, is precluded from setting up the forgery or want of authority.

[3]As to pre-Code treatment of the implications of preclusion as such, particularly its identification with estoppel and negligence, see Annots. 39 *A. L. R.* 2d 641 (1955); 87 *A. L. R.* 2d 638 (1963); 67 *A. L. R.* 3d 144 (1975); *Bd. of Ed., Twp. of Jefferson v. National, etc., Bank,* 121 *N. J. L.* 177 (E. & A. 1938); but *cf. Strader v. Haley,* 216 *Minn.* 315, 12 *N. W.* 2d 608 (Sup. Ct. 1943).

meaning in the law of agency. Ratification is defined in Section 82 of *Restatement of Agency* 2d (1957):

Ratification is the affirmance by a person of a prior act which did not bind him but which was done, or professedly done on his account, whereby the act, as to some or all persons, is given effect as if originally authorized by him.

Approval of these principles is found in *Goldfarb v. Reicher*, 112 *N. J. L.* 413 (Sup. Ct. 1934), aff'd o.b. 113 *N. J. L.* 399 (E. & A. 1934). Ratification requires intent to ratify plus full knowledge of all the material facts. *Passaic-Bergen Lumber Co. v. United States Trust Co.*, 110 *N. J. L.* 315 (E. & A. 1933); 2 Anderson, *U. C. C.* § 3-404:7, p. 924 (2d Ed. 1971). Ratification may be express or implied, and intent may be inferred from the failure to repudiate an unauthorized act, *East Orange v. Bd. of Water Comm'rs. of East Orange*, 73 *N. J. Super.* 440 (Law Div. 1962), aff'd 40 *N. J.* 334 (1963); *Johnson v. Hospital Service Plan of N. J.*, 25 *N. J.* 134 (1957); from inaction, *Vogt v. Borough of Belmar*, 14 *N. J.* 195 (1954); or from conduct on the part of the principal which is inconsistent with any other position than intent to adopt the act. *Common Wealth Ins. System, Inc. v. Kersten*, 40 *Cal. App.* 3d 1014, 115 *Cal. Rptr.* 653 (Ct. of App. 1974).

A ratification, once effected, cannot later be revoked, *Restatement of Agency* 2d, *op.* cit. *supra*, § 102, even where the ratification may have been induced by the anticipation of benefits which fail to accrue. *American Cast Iron Pipe Co. v. American R. Co.*, 87 *F.* 2d 250 (1st Cir. 1936). Distinguish the case of the payee of a check who was fraudulently induced to indorse it, the fraud-doer himself thereafter improperly indorsing it for collection. Such payee was held nevertheless entitled to recover against the collecting bank and not to have ratified the unlawful indorsement where she promptly repudiated the transaction upon learning of the fraud and made demand upon the collecting

bank. *Salsman v. National Community Bank of Rutherford, supra* (102 *N. J. Super.* 482).

██ Application of the principles of law outlined herein to the facts before us makes it clear that the Law Division and Appellate Division soundly ruled that a case of ratification was made out as a matter of law. Thermo, through Kueller, was confronted with Kashulines' unauthorized appropriation of these checks in November 1971. It is to be kept in mind that the latter had a 75% beneficial interest in those funds and that Thermo had a significant economic stake in continuing its business relationship with Kashulines as a subcontractor on Thermo's ongoing government work. Thermo was thus willing to forego collecting its relatively small interest in the Seabrook checks to obtain an assurance that Kashulines would continue to work for it as a subcontractor. Not until six months later, when Kashulines, apparently financially strapped, stopped working on a Thermo job, did Thermo change its position of acquiescence in and affirmance of Kashulines' acts and attempt to hold the various defendants herein on the basis of Kashulines' lack of authority to negotiate the checks.

Persuasive authority militates against Thermo's contention that it did not ratify the indorsements. A principal must either ratify the entire transaction or repudiate it entirely, and cannot pick and choose only what is advantageous to him. *Canadian Improvement Co. v. Lea*, 74 *N. J. Eq.* 234 (Ch. 1908); *Restatement of Agency* 2d, *op.* cit. *supra*, § 96. The principle as stated in 2A *C. J. S. Agency* § 77, p. 672–3 is as follows:

\* \* \* the principal cannot ratify that part of the transaction which is advantageous to himself while repudiating the burdensome part, *and the principal may not make ratification conditional upon his suffering no loss.* [Emphasis added].

See also *Cram v. Tippery*, 175 *Or.* 575, 155 *P.* 2d 558 (Sup. Ct. 1945); *Southern Bell Telephone & Telegraph Co. v.*

*WRNO,* 216 *S. C.* 533, 59 *S. E.* 2d 146, 147 (Sup. Ct. 1950) (*dictum*).

In *American Cast Iron Pipe Co. v. American R. Co., supra,* an agent received from defendant checks for sums due the plaintiff-principal, indorsed them without authority and diverted the funds. When the plaintiff learned the facts the agent promised to make reimbursement, remitting a check which was protected for lack of funds. Although the principal had notified the defendant of the diversion and of its intent to hold it accountable for failure to make payment directly to the principal, the latter nonetheless continued to press its claim against the agent until the financial condition of the latter became so impaired that recovery was impossible. When the principal then tried to pursue the defendant, recovery was barred. "A principal cannot accept its agent's acts, and, after it finds it cannot realize from the agent, then have recourse to a third party, who was its original debtor." 87 *F.* 2d at 253. The promise of restitution by the agent, like Kashulines' promise to make good, was acceptable to the principal until recovery seemed impossible. Then and only then was a claim based on the forgery of the indorsement pursued.

A comparable situation arose in *Rakestraw v. Rodrigues,* 8 *Cal.* 3d 67, 104 *Cal. Rptr.* 57, 500 P. 2d 1401 (Sup. Ct. 1972). A wife learned that her husband had forged her name to a note and deed of trust of property owned by her to obtain a loan for his supermarket enterprise. She did nothing to repudiate the forgeries until both her marriage and the business failed, and her attempt then to do so was barred. "It thus appears as a matter of law that Joyce affirmatively endorsed the fraudulent acts * * * in anticipation of benefits to be gained and sought to negate her endorsement thereof only when benefits failed to materialize as anticipated." 500 *P.* 2d at 1406. The appellate court held there was ratification as a matter of law and reversed a judgment based on a jury verdict to the contrary.

■ Thermo strenuously argues that the issue of ratification here was one of fact, triable by a jury, and not so clearly beyond reasonable dispute as to warrant entry of summary judgment. We do not agree. There was no *genuine* issue of underlying fact here, even recognizing, as we do, that ordinarily conclusory facts. as well as underlying operative facts, if reasonably disputable, should be tried rather than determined by summary judgment or by judgment as a matter of law. *Cf. Bonnet et al. v. Stewart,* 68 *N. J.* 287, 296, 297 (1975). Here we find no genuine issue of material fact relevant to the issue of ratification which could warrant withholding summary judgment. *R.* 4:46–2.

There are undisputed facts in this record which would compel a reasonable fact-finder to conclude that Thermo ratified the actions of Kashulines with respect to the checks in question. Thermo has not suggested any possible evidence it might expect to be adduced at a trial which could affect the conclusive legal significance we have determined attaches to the proofs of record. Summary judgment was therefore properly entered against Thermo.

Judgment affirmed.

PASHMAN, J. (concurring and dissenting). This case represents a multi-party action arising from a series of financial transactions whose focal point is four checks drawn by Seabrook Farms Co., Inc. (Seabrook) between March and June 1971. These checks, which plaintiff Thermo Contracting Corp. (Thermo) claims as its rightful compensation, were delivered to Peter T. Kashulines, subcontractor for Thermo or his agents. Although all of these checks were made payable to Thermo, they were endorsed by and deposited in an account belonging to Kashulines. Payment was made on these endorsements by defendant The Bank of New Jersey.

The suit which was originally filed by Thermo alleged conversion and negligence by The Bank of New Jersey, negli-

gence by Seabrook and conversion by Kashulines.[1] The filing of this suit was followed by a proliferation of cross-claims and counterclaims and the assertion of various defenses. When reduced to its bare essentials, the case basically considers only two questions on appeal: (1) What liability accrues to The Bank of New Jersey for its wrongful payment to Kashulines on his endorsement; and (2) What is Seabrook's liability for its misdelivery to Kashulines?

Properly considered these two questions concern different issues and involve different parties. Therefore, they can, and in my opinion do, command different dispositions. Accordingly, because there is a genuine issue of material fact as to the ratification by Thermo of Kashulines' authority to endorse the checks, I would concur in the result reached by Justice Schreiber in his dissenting opinion and would reverse the summary judgment entered in favor of the Bank. The issue of the Bank's liability should be remanded for trial.

On the other hand, I find that Thermo clothed the subcontractor Kashulines with apparent authority to receive payment from Seabrook and should not be heard to complain of the consequences of its own actions. I therefore concur in the result of the majority to the extent that summary judgment be entered against Thermo in its action against Seabrook.

SCHREIBER, J., dissenting. I must respectfully dissent from the proposition that a bank which wrongfully converts checks must be freed as a matter of law from its responsibility to the payee where the payee has not unequivocally agreed to that relinquishment.

Thermo Contracting Corp. (Thermo), a general contractor, engaged in business primarily with the federal government. Frequently it would subcontract the entire project,

---

[1] A fourth party, the drawee-bank, First National State Bank of New Jersey was also charged with conversion and negligence.

limiting its participation to purchases of some of the materials and insurance, and handling administrative details. The subcontractor would supervise the project, furnish all the labor, and install the materials.

In such a manner did Peter T. Kashulines serve as a Thermo subcontractor between January 1970 and May 1972. Of approximately 200 contracts which Thermo had in that period, Kashulines was the subcontractor for some 12 to 14 jobs. Throughout the entire period Kashulines, as Thermo's subcontractor, was engaged in federal government work.

About November 1970 Kashulines believed that some business could be transacted with Seabrook Farms Co., Inc. (Seabrook). He knew that Seabrook wanted to remove six greenhouses from its farm at Seabrook, New Jersey. Kashulines also knew that he could not obtain the contract on his own because he did not have the financial capability, cash working capital or ability to obtain and produce the necessary workmen's compensation and public liability insurance policies. He then discussed with Thermo's president, Alexander Kueller, the possibility of obtaining the contract for Thermo. Kashulines and Kueller agreed that Kashulines, as Thermo's representative, would bid for the project and, if successful, would supply the labor and equipment as he did on other Thermo jobs. Thermo, on the other hand, would accept the order, furnish the insurance certificates, and maintain the administrative and financial records. Thermo was to receive 25 percent of the contract price (a percentage which was comparable with the gross profits Thermo received from other projects on which Kashulines was the subcontractor).

Kashulines submitted on Thermo stationery, as Thermo's representative, a proposal for removal of the greenhouses. Seabrook accepted the proposal with a purchase order addressed to Thermo. Kashulines' employees did the work. Thermo's certificate of insurance was furnished. Invoices were submitted on a Thermo letterhead.

Kashulines, with Kueller's approval, obtained two other purchase orders from Seabrook. The arrangements between Kashulines and Thermo were the same except that new tubes for a refractory on a boiler had to be purchased, which Thermo agreed to order. Each proposal was made by Kashulines as Thermo's agent. Each Seabrook purchase order was addressed to Thermo. Each invoice to Seabrook bore Thermo's letterhead. Thermo furnished the certificates of insurance for each job. It ordered some $2600 worth of material for the two projects. William De Santis, Seabrook's Manager of Engineering, called and spoke with Kueller on several occasions about the progress of the work. De Santis also submitted a complaint to him about some damage caused by the workmen. When Kashulines failed to complete the removal of the greenhouses, Seabrook charged Thermo with that failure. It was Thermo which incurred the exposure of a contracting party.

Seabrook paid all the invoices by checks, five in number. The initial check was delivered to and deposited by Thermo. Some of Kashulines' employees picked up the remaining four checks and delivered them to him.

When Kueller learned of Kashulines' defalcations in November 1971, he agreed to give Kashulines an opportunity to rectify the wrong, for he "had faith in the man." More importantly, Thermo did not want to risk possible default on its government contracts in the event that Kashulines' employees stopped working. Consequently, Kashulines continued as the subcontractor on Thermo's government contracts. As indicative of this ongoing relationship, when Kashulines did not have the funds to pay his employees, Thermo, as it had in the past, continued to advance cash to Kashulines so that he could meet his payroll. As Kueller put it, he could not dare jeopardize a $250,000 job for the sake of $13,000, the approximate face amount of the four checks. The relationship between Thermo and Kashulines terminated in May 1972 after Kashulines finished part of

a Thermo contract with the Navy to drill a well on Ascension Island.

The four checks in question were drawn by Seabrook on the First National State Bank of New Jersey. Three checks were payable to Thermo Contracting Corp. and one to Thermo Contracting Co. The indorsements varied, but all were indorsed for deposit to the account of American Boiler Co. The indorsement on one, for example, read: "Thermo Contracting Corp. Deposit to the account of American Boiler. Peter T. Kashulines." The checks were dated March 25, 1971, April 7 and 23, 1971, and June 22, 1971. Each was deposited shortly after those respective dates with The Bank of New Jersey where Kashulines maintained an account for his company, the American Boiler Co. The Bank of New Jersey collected the funds from the drawee bank and credited the account of the American Boiler Co. All the checks had been paid long before Kueller became aware in November 1971 of Kashulines' unauthorized acts.

It is not our province on a summary judgment motion to evaluate Thermo's business morality on the basis of its contemplated profits on the Seabrook contracts. Kashulines was not legally justified in seizing and indorsing the checks for his personal benefit. Nor was The Bank of New Jersey justified in crediting the proceeds to the American Boiler Co. account. In this action Thermo seeks to right the wrongs done it by the two tort-feasors.

The Bank of New Jersey tortiously converted the proceeds of the checks by diverting the funds to the American Boiler Co. Payment by a bank of a check payable to a corporation, indorsed by an unauthorized person to a second corporation, is illegal, and the bank makes such a payment at its peril. *Passaic-Bergen Lumber Co. v. United States Trust Co.*, 110 *N. J. L.* 315 (E. & A. 1933); *Singer Sewing Machine Co. v. Citizens Nat. Bank, Englewood*, 111 *N. J. L.* 199 (Sup. Ct. 1933); Annotation, "Right of check owner to recover against one cashing it on forged or unauthorized indorsement and procuring payment by drawee," 100 *A. L. R.* 2d 670 (1965).

In the absence of a corporate resolution authorizing the transfer of the check to another party, proceeds of a corporate payee check may only be credited to the account of the payee corporation. The bank is put on notice whenever the payee is a corporation that the check proceeds must be paid to the corporation, unless of course the corporation directs otherwise.

These principles have been substantially incorporated in the Uniform Commercial Code. *N. J. S. A.* 12A:3–404 provides that any unauthorized signature is "wholly inoperative as that of the person whose name is signed unless he ratifies it or is precluded from denying it".[1] Collection of the funds by The Bank of New Jersey constituted a conversion. *Salsman v. Nat'l Com. Bank of Rutherford,* 102 *N. J. Super.* 482 (Law Div. 1968), aff'd o. b. 105 *N. J. Super.* 164 (App. Div. 1969); *Teas v. Third Nat'l Bank & Trust Co.,* 125 *N. J. Eq.* 224 (E. & A. 1939). The bank does not question its wrongdoing but seeks to avoid responsibility because of the payee's ratification. It is important to recognize that the issue of ratification arises within a factual context which concerns an innocent payee of a check whose agent has, in effect, forged the indorsement, and of a collecting and depositary bank which, although it should have been aware of that fact, wrongfully honored that check.

[1]Under *N. J. S. A.* 12A:3–419(1)(c) an instrument is converted when it is paid on a forged indorsement but the monetary responsibility on the part of a collecting bank, which acts in accordance with reasonable commercial standards, is limited to the proceeds of the instrument remaining in its hands. *N. J. S. A.* 12A:3–419(3).

The plaintiff did not appeal from the summary judgment entered in favor of the First National Bank of New Jersey, probably because The Bank of New Jersey recognized and admitted at the oral argument on the motion for summary judgment that it did not act in accordance with reasonable commercial standards. The payee may bring a conversion action against the drawee and recover the face amount of the check. *N. J. S. A.* 12A:3–419(2). In that event the collecting bank may be liable to the drawee bank on the warranties arising out of the presentment and transfer. *N. J. S. A.* 12A:3–417 and 12A:4–207.

A principal, having full knowledge of all the material facts, who approves its agent's unauthorized act, is deemed to ratify that act. The effect and extent of ratification depend upon the circumstances within which it occurs and the nature of the specific acts to be confirmed. For example, an agent without authority may nonetheless enter into a contract on behalf of the principal to purchase or sell certain products. As between the third party and the principal, the principal would have to ratify the entire agreement. He could not pick and choose only the favorable aspects of the contract. On the other hand, where the agent and the third parties have committed tortious acts for which they may each be respectively responsible to the principal as tort-feasors, then the principal may accept partial redress from the agent without relinquishing his right to complete satisfaction from the third party.[2]

In all ratifications the intent of the principal to accept and adopt the unauthorized act of the agent must be clearly established. *Passaic-Bergen Lumber Co. v. United States Trust Co., supra.* Intent can only be meaningful if the ratifying party is aware of all the relevant facts unless he desires to ratify irrespective of that knowledge. In *Passaic-Bergen Lumber Co. v. United States Trust Co., supra,* the Court wrote:

In order that ratification may be shown, it is incumbent on defendant to prove that the plaintiff had full knowledge of all the material facts. [110 *N. J. L.* at 318].

The principal, cognizant of the relevant data, must then demonstrate the intent to adopt and accept the unauthorized

---

[2]The majority opinion relies on a quotation from 2A *C. J. S. Agency* § 77, at 672–673 to the effect that a principal may not ratify his agent's act conditionally upon his principal's suffering no loss. This principle applies in the contract example of the type described in the text, but not where tort-feasors are involved. The text states that "[t]he rule that ratification must affirm the entire transaction has been held to be inapplicable as between joint tort-feasors; and it does not extend to separate and independent transactions." *Id.* at 673 [footnotes omitted].

act. Intent may be manifested by language or conduct. Where conduct is relied upon to constitute ratification as a matter of law, it must be consistent with an intent to affirm the unauthorized act and inconsistent with any other purpose. *Restatement, Agency* 2d § 83(b) at 212–213 (1958), Comment c.; Seavey, "Ratification by Silence," 103 *U. Pa. L. Rev.* 30–31, 40–42 (1954). Recognized types of such inconsistent conduct occur when the principal receives or retains the benefits of the unauthorized transaction to which he would not be entitled absent ratification; or where the principal asserts a claim or defense dependent for its validity upon the unauthorized act.

The majority seems to rely upon Kueller's conduct in concluding that ratification was established as a matter of law on the summary judgment motion. Reference is made to his (a) not proceeding against The Bank of New Jersey in November 1971; (b) conducting other business with Kashulines besides the Seabrook transaction; and (c) not moving against the bank until there was a complete breakdown in the business relationship with Kashulines. None of these matters, either individually or *in toto,* establish *as a matter of law* the proposition that Kueller approved the forgery of the checks and conversion of the funds by Kashulines. The proof is not conclusive that Kueller ever intended to free the bank from its liability if Kashulines did not pay the monies unlawfully taken by him. Although some five months passed before Kueller decided to proceed against The Bank of New Jersey, this inaction is not necessarily consistent with ratification of Kashulines' wrongs. Kueller's delay is equally consonant with the concept that the principal would look to the tort-feasor bank if the agent did not rectify his defalcation. Is it reasonable to conclude that Kueller would have been willing to absolve the bank and accept only Kashulines' responsibility rather than deciding to look primarily to Kashulines, and, if he did not pay, then to seek redress from the bank? This is not to say that lapse of time may not

be a factor which a fact finder may consider with other appropriate circumstances to determine if the principal has approved of the unauthorized acts of his agents.[3]

The fact that the plaintiff continued its business relationship with Kashulines to prevent default on plaintiff's government contracts represents conduct not necessarily consistent with approval of the agent's wrongdoing so as to free the wrongdoer bank. The Seabrook contract was not related in any way with plaintiff's government contracts. Seavey in his *Handbook of the Law of Agency* (1964) describes the import of independent contracts in the following manner:

\* \* \* An indivisible transaction such as a contract or conveyance, can be ratified only in its entirety. In cases involving consensual affirmance, the question is one of the interpretation of the consent given, that is, whether there was a willingness to accept the transaction with all its terms; if less than that there is no ratification but something like a counter offer. In cases involving inconsistent conduct, there either is or is not conduct which is so inconsistent that it is equitable to create the liabilities or loss of rights which result from ratification.

These cases must be distinguished from those in which there are several distinct transactions. If there is a series of transactions, the initial ones can be affirmed without ratification of later ones. Thus if an agent makes an unauthorized settlement, receiving a check in payment and then cashes the check, the principal can ratify the receipt of the check without affirming the endorsement. Likewise there may be a number of independent simultaneous transactions. If these are independent of each other, one may be ratified without affirming the others. In a case involving an "oil" lease

---

[3]When Kueller learned of the conversion of the funds, the monies had already been paid by the drawee and collecting banks. The record is not clear whether the banks suffered any prejudice as a result of not knowing of the Kashulines forgery. Nor, of course, was there any reliance by the banks on the plaintiff's conduct. In the absence of prejudice, preclusion from denying ratification, or estoppel ratification of the agent's act would not lie. It has been indicated that laches will not operate as a valid defense unless the collecting bank has been injured by the delay. *Lindenthal v. Northwest State Bank*, 221 Ill. App. 145 (1921) ; *Independent Oil Men's Ass'n v. Fort Dearborn Nat. Bank*, 311 Ill. 278, 142 N. E. 458 (1924).

for three separate tracts of land, a court of equity was persuaded that since the tracts were distinct units, the lease of one not being dependent upon the lease of the others, there could be ratification as to some, without affirmance as to the remaining one to which the principal had not assented; perhaps good sense on the facts. [§ 38 at 72; citations omitted].

The majority emphasizes the fact that while Kashulines was working on the government matters Kueller did not press or back-charge him. But such conduct does not as a matter of law reflect an intent to relieve The Bank of New Jersey from its responsibility. To the contrary, it could be argued that pressuring and back-charging would perhaps indicate that Kueller was looking only to Kashulines and not the bank. The failure to dun and, back-charge supports the conclusion that the plaintiff was comforted by the thought that the bank's financial responsibility was always available if Kashulines failed to pay. That the principal derives and accepts benefits arising from independent transactions and not the unauthorized act does not and cannot support the concept of ratification as a matter of law. In 1 *Mechem, Agency* (2d ed 1914) § 439 the proposition has been stated in this manner:

* * * acceptance and receipts of the benefits must, to work a ratification, have been voluntary, and must find their warrants in rights flowing from the act. For, if the principal had no choice, if the benefits could not be separated from something to which he was in any event entitled, or if his act was not confirmatory, as where he would have been entitled to the same benefit independently of the act in question, the acceptance and receipt under such circumstances would not constitute a ratification. [at 322].

The majority does not contend that the principal expressly or impliedly ratified Kashulines' acts at the time the November discussion occurred between Kueller and him. This is understandable, for all Kueller said was that he was willing to have Kashulines pay the wrongfully diverted funds "as soon as he possibly could". This understanding is not necessarily inconsistent with the thought that the plaintiff

did not intend in any event to forego its claim against the bank which had wrongfully warranted the unauthorized indorsement and converted the funds which it received on the basis of that indorsement. Inaction against the bank does not conclusively establish the plaintiff's state of mind.[4]

The majority relies substantially on two decisions for its position. A factual recitation demonstrates the inapplicability of both cases. In *Rakestraw v. Rodrigues*, 8 *Cal.* 3d 67, 104 *Cal. Rptr.* 57, 500 *P.* 2d 1401 (Sup. Ct. 1972), a husband forged his wife's (Joyce) name to a $75,000 note and to a mortgage on some realty she owned. The lender's check was made payable to both husband and wife, which check she indorsed. Shortly after Joyce indorsed the check, she learned of the forgeries and consulted an attorney. She did not heed his advice to immediately notify the creditor. The bulk of the funds were applied to a supermarket business, a corporation all of whose stock was owned by the husband. She then demanded but was refused stock in the supermarket enterprise, and thereafter took an active role in its affairs. Joyce, in fact, received some direct monetary benefits from the loan. The corporation applied $1,000 of the funds to reduce an indebtedness owed to her; over $3,600 was paid for taxes owing on some property owned by her; and her husband's pay checks were deposited in a joint account in their names. When Joyce was sued three years after she discovered the forgeries, she filed a third party claim against one Rodrigues who had allegedly misrepresented to a notary public that her signature appeared on the note and mortgage. The defense of ratification was sustained because she had accepted the benefits of the unauthorized transaction.

---

[4]Seavey in "Ratification by Silence" comments that: "As in other determinations of states of mind, the question whether the failure to act indicated a willingness which causes the affirmance is a matter for the jury unless the proved facts are clear beyond a substantial doubt." 103 *U. Pa. L. Rev.* at 39.

In *American Cast Iron Pipe Co. v. American R. Co.,* 87 *F.* 2d 250 (1 Cir. 1936), the court upheld a jury verdict which found that ratification existed. The defendant-debtor delivered its check in payment of the indebtedness due the plaintiff to the plaintiff's agent. The check was payable to the agent, which deposited the check in its account. The agent ultimately transmitted its check to the plaintiff. That check was dishonored for insufficient funds, and plaintiff instituted a suit against the debtor. The court concluded that, on the basis of correspondence between the plaintiff and defendant, plaintiff's acceptance of the agent's check by indorsement and deposit, and plaintiff's persistent efforts to collect from the agent, the jury would have been warranted in finding that the plaintiff had ratified its agent's act in accepting payment from the defendant. This case confirms the proposition that the inferences to be drawn under these circumstances to establish ratification are for the fact finder.

Although the underlying operative facts relied upon on this summary judgment motion are substantially undisputed, conflicting inferences may be drawn from those facts. "Facts are not to be stretched, or ambiguous, inconclusive or independent acts made the basis of a ratification." *Gates v. Bank of America Nat. Trust & Sav. Ass'n,* 120 *Cal. App.* 2d 571, 261 *P.* 2d 545, 547 (D. Ct. App. 1953); 1 *Mechem, supra,* § 474 at 348. This precaution is peculiarly appropriate where intent must be shown. The applicable standard on summary judgment motions remains inviolate: "All inferences of doubt are drawn against the movant in favor of the opponent of the motion. The papers supporting the motion are closely scrutinized and the opposing papers indulgently treated * * *." *Judson v. Peoples Bank & Trust Co. of Westfield,* 17 *N. J.* 67, 75 (1954). This standard has not been met.

Seabrook also contends that it is entitled to a summary judgment in its favor because Thermo had no interest in its contract with Seabrook. There is evidence in the record to the contrary. Seabrook also argues that delivery of the

checks to Kashulines was authorized and that its liability to Thermo is discharged. However, there is a factual question of whether delivery of the checks to Kashulines was authorized. I note that Seabrook mailed the initial payment to the plaintiff.

For all the foregoing reasons I would reverse the summary judgments entered in favor of Seabrook and The Bank of New Jersey and the judgments on the crossclaims filed among all the defendants, and remand for trial.

*For affirmance*—Chief Justice HUGHES, Justices MOUNTAIN, SULLIVAN and CLIFFORD, and Judge CONFORD—5.

*For reversal and remandment*—Justice SCHREIBER.

Justice PASHMAN, concurring and dissenting.