BANK OF HOVEN, A Banking Corporation, Plaintiff and Appellee,

v.

William RAUSCH, Defendant and Appellant.

No. 14966.

Supreme Court of South Dakota.

Considered on Briefs Jan. 13, 1986.

Decided Feb. 19, 1986.

Rehearing Denied March 26, 1986.

Clark W. Bormann of Bormann, Buckmeier & Bormann, Mobridge, for plaintiff and appellee.

Max A. Gors of Gors, Braun, Carlon, Smith & Zastrow, Pierre, and Jarvis Brown, Faulkton, for defendant and appellant; Laurence J. Zastrow of Gors, Braun, Carlon, Smith & Zastrow, Pierre, on brief.

WUEST, Justice.

This is an appeal from a judgment in a trial before the court granting recovery on a promissory note. We reverse.

In early April of 1978, Harlan Rausch (Harlan) asked appellee, Bank of Hoven (Bank), to lend him $75,000 for his farming operation. Bank informed Harlan that his credit was not sufficient to acquire the loan unless his father, William Rausch (William), cosigned the promissory note. On April 18, 1978, a note was executed and Harlan received the loan he requested. At trial, a promissory note bearing William's

signature was admitted as evidence of the loan. William testified that it was not the note he signed, since it did not also bear his son Harlan's signature. William did, however, acknowledge signing a promissory note for $75,000 on April 18, 1978, but contended that he signed merely as a cosigner or guarantor and that his obligation was short-term, existing only until his son received a loan from the Farmers Home Administration.

On May 1, 1979, the promissory note was cancelled by Bank and another note was issued in its place. This promissory note was for the same principal amount of $75,000, although at a higher interest rate, and contained a signature purported to be William's. Harlan testified, however, that he placed William's signature on the instrument without William's knowledge. This process occurred on three more occasions, the last being July 28, 1982. Although expert testimony as to the authenticity of the signatures on the promissory notes was conflicting, the trial court found that Harlan did, in fact, sign his father's name to the instruments.

Bank brought suit on the 1982 note and William argued that his legal obligation was terminated when the original promissory note was cancelled in 1979. The trial court disagreed and held in its memorandum opinion that William was a participant in the continuing credit transactions between his son and Bank. The court determined this on the basis of testimony given by Bank's handwriting expert, that the signature on a financial statement allegedly signed in 1980 at the time of a note renewal, and the signature on a security agreement signed at Bank in 1981, were both William's signatures. The court held the expert's findings were substantiated by the testimony of two bank employees, Charles Simon (Simon) and Royce Hackl (Hackl). Simon testified that on July 9, 1980, Harlan and William came into Bank and discussed the renewal of the $75,000 note with him. Simon stated he prepared a financial statement and note, handing them across the desk to William for his signature. Simon

said he did not recall actually seeing William sign the documents, but just assumed that he had. William testified he signed neither document. According to Hackl, William signed a security agreement while in the bank in 1981.

The trial court found the testimony of these witnesses dispositive, concluding

that primarily from [appellant] William Rausch's involvement in the 1980 note renewal, but to some degree also his involvement in the signing of the 1981 security agreement, that he had at that time a continuing knowledge of the transaction of the note renewal. This obligated him for the $75,000 credit to his son Harlan because the same was obtained by his appearance at the bank and his signing of the financial statement. His name appears on the note that Mr. Simon testified was handed to him for his signature. Even if his son had signed his name on it, under the circumstances of the case, he is bound thereby.

It is argued the statute controlling this action is SDCL 57A–3–404(1), which was taken verbatim from the Uniform Commercial Code section 3–404, and states in pertinent part: "Any unauthorized signature is wholly inoperative as that of the person whose name is signed *unless he ratifies it or is precluded from denying it* [.]" (Emphasis added). Liability under this statute is restricted to negotiable instruments as defined in SDCL 57A–3–102(1)(e) and SDCL 57A–3–104. Promissory notes are included under SDCL 57A–3–104(2)(d). An "unauthorized" signature is "one made without actual, implied or apparent authority and includes a forgery." SDCL 57A–1–201(43).

■ For the purposes of negotiable instruments law, the meaning of ratification is not dissimilar from its general meaning in the law of agency. "Ratification" is defined in Restatement (Second) of Agency § 82 (1958) as follows:

Ratification is the affirmance by a person of a prior act which did not bind him but which was done or professedly done on his account, whereby the act, as to some or all persons, is given effect as if originally authorized by him.

The affirmance required to establish ratification may be either express or implied from conduct showing an election to treat an unauthorized act as authorized, or by conduct which can be explained only if there was such an election. *Rakestraw v. Rodrigues*, 8 Cal.3d 67, 104 Cal.Rptr. 57, 500 P.2d 1401 (1972); *Thermo Contracting Corp. v. Bank of New Jersey*, 69 N.J. 352, 354 A.2d 291 (1976); *Eutsler v. First Nat. Bank of Pawhuska*, 639 P.2d 1245 (Okla. 1982); Restatement (Second) of Agency § 83 (1958); White and Summers, Uniform Commercial Code 402 (1972). Ratification requires intent to ratify plus full knowledge of the material facts. *Thermo Contracting Corp., supra; United Bank v. Mesa N.O. Nelson Co.*, 121 Ariz. 438, 590 P.2d 1384 (1979); *Pargas, Inc. v. Estate of Taylor*, 416 So.2d 1358 (La.App.1982); 6 Anderson, Uniform Commercial Code § 3–404:21 p. 154 (1984). "Where a principal accepts the benefits of the agent's transaction with knowledge of all material facts there is a ratification so that the agent-made signature of the principal on commercial paper is binding upon the principal." *Id.* at § 3–404:21 pp. 154–155.

■ Under SDCL 57A–3–404, even if a party does not ratify the unauthorized signature, he may still be "precluded from denying it." The Uniform Commercial Code comment to this section adds the following explanation:

The words "or is precluded from denying it" are retained in subsection (1) to recognize the possibility of an estoppel against the person whose name is signed, as where he expressly or tacitly represents to an innocent purchaser that the signature is genuine; and to recognize the negligence which precludes a denial of the signature.

U.C.C. § 3–404 comment 4. As explained in White and Summers, at 402:

Several Code sections give content to the notion of "preclusion." For example, 3–406 provides that "Any person who by his negligence substantially contributes

to ... the making of an unauthorized signature is precluded from asserting the ... lack of authority against [certain persons]...." Similarly, 3–405 outlines three situations where "An indorsement by any person in the name of the named payee is effective...."

The preclusion language of U.C.C. § 3–404 authorizes an equitable estoppel to avoid an unconscionable result. *Cooper v. Union Bank*, 9 Cal.3d 371, 107 Cal.Rptr. 1, 507 P.2d 609 (1973).

> Negligence and contributory negligence are not relevant to equitable estoppel under UCC § 3–404 as they would be to preclusion under § 3–406. In order to raise the defense of unauthorized signatures, a bank is not required to show that it has acted in good faith and in accordance with reasonable commercial standards, as is required when the bank raises the defense of preclusion under UCC § 3–406.

6 Anderson Uniform Commercial Code § 3–404:8 pp. 147–148 (1984); *see also American Travel v. Central Carolina Bank*, 57 N.C.App. 437, 291 S.E.2d 892 (1982); *Swiss Credit Bank v. Chemical Bank*, 422 F.Supp. 1305 (S.D.N.Y.1976).

While determining that William was liable on the promissory notes executed because of his involvement in the 1980 note "renewal," and his signing of the 1981 security agreement, the trial court did not specifically hold that William ratified the signing of his name to the successive notes. As our decision is premised on liability under SDCL 57A–3–404(1), we are called upon to determine whether William ratified the documents, or is precluded from denying the signatures under the doctrine of equitable estoppel.

 The suit was on the 1982 note and judgment rendered on it. There is absolutely no evidence in the record establishing a ratification or preclusion regarding the 1982 note. The court found Harlan signed his father's name to this note. It was not a renewal note. The "renewal" of a promissory note means the reestablishment of a particular contract for another period of time. ·*King v. Edel*, 69 Ga.App. 607, 26 S.E.2d 365 (1943); P.A. *Dufresne v. Hammersten*, 61 Idaho 714, 106 P.2d 861 (1940); *First Nat. Bank in Albuquerque v. Abraham*, 97 N.M. 288, 639 P.2d 575 (1982). Each note signed in this action had a different interest rate. The rate of interest is a material term in a contract. *First Nat. Bank, supra; Belt v. Stover*, 157 Okl. 176, 11 P.2d 519 (1932).

As explained in 11 Am.Jur.2d *Bills and Notes* § 307, at p. 332:

> A renewal signifies the substitution in place of one engagement of a new obligation on the same terms and conditions; that is, the re-establishment of a particular contract for another period of time. An obligation is renewed when the same obligation is carried forward by the new paper or undertaking, whatever it may be. There may be change of parties. There may be an increase of security, but there is no renewal unless the obligation is the same. What makes the renewal is an extension of time in which to discharge the old obligation.

In *First Nat. Bank, supra*, the Supreme Court of New Mexico held that the change in interest rate from one note to the next constituted a different obligation, stating:

> The record shows that the renewal note of October 1979 was executed by FNBIA and Abe Abraham only. Interest provided for in the May 1979 note was 10.5%. The rate of interest provided for in the October 1979 note was 13%. Rate of interest was a material change from prior note and a new indebtedness resulted.

97 N.M. at 291, 639 P.2d at 578.

In *Liberty National Bank and Trust Co. v. Dvorak*, 199 N.W.2d 414 (N.D.1972), the North Dakota Supreme Court concluded that a subsequent note did not evidence the same obligation because of an increase in the principal debt and monthly payments.

The record in the instant action shows that the original 1978 note provided for interest at a rate of 9%. Thereafter, the interest rate rose on a yearly basis as fol-

lows: 10% in 1979; 14% in 1980; 17% in 1981; and 17½% in 1982.

We conclude there was no ratification of this 1982 note because it was not a renewal note and ratification is the affirmance by a person of a *prior* act, which did not bind him. As to preclusion, there is no evidence upon which the trial court could possibly find that William was equitably estopped from denying the 1982 note, as the documents relied upon by the court predated the 1982 note.

The judgment of the trial court is reversed.

FOSHEIM, C.J., MORGAN and HENDERSON, JJ., and HERTZ, Circuit Judge, acting as a Supreme Court Justice, concur.